UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DISTRICT

JESSE ORTIZ,
       Plaintiff,                               Case No: 2:11-cv-03123(STA)
                                                    JURY TRIAL DEMANDED

vs.

THE HERSHEY COMPANY,
       Defendant.

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

## FACTS

1. Plaintiff, Jesse Ortiz, began working at the Hershey Company, Memphis Plant, following a buy-out of the Life Savers Company in Holland, Michigan, on October 28, 2001. (Plaintiff's Aff. ¶ 1.)

2. That Plaintiff performed primarily in the position of Day Shift Press Operator in the mints department throughout the entirety of his employment with the Defendant. (Love Declaration ¶ 6.)

3. That the three (3) day shift press operators at Hershey's were Angie Salas, Hispanic-American, Wes Garlock, Caucasian American, and Jesse Ortiz, Hispanic American, (Plaintiff's Affidavit ¶ 1.)

4. That Gary Johnson, African American, worked for the Defendant in the position of back-up press operator. (Johnson Deposition, p. 9, lines 12-24.)

5. That Wes Garlock began employment at the Hershey's Memphis Plant shortly after Jesse Ortiz. (Garlock, Deposition, p. 25, lines 19-23.)

1

6. That Wes Garlock's job of press operator consisted of monitoring 2-3 presses, making tablets within specification, sending them down a conveyor system through the metal detector to packaging, and balking off 335 lb. drums , when required, to add or remove tablets. Wes Garlock was press operator until June 2010 when he bid into the mechanic department at Hershey. (Garlock Tr. 11-12: 20-24,1-20, 11: 12-13.)

7. That Angie Salas ran three (3)presses and balked off barrels when needed. She was responsible for paperwork, ½ hour weight checks for hardness and size of the candy, and performing hourly metal detector checks. (Salas Tr. 7:12-24)

8. That Jesse Ortiz, Plaintiff, in his job as Press Operator, ran four (4) presses, an additional 1B2 which required an hourly metal check, in addition to the checks required for the presses. (Ortiz Aff. ¶ 8.)

9. That Jesse Ortiz, Plaintiff, was required, due to the add-on, to mix candy, roll full 335 lb. barrels to the chute for pouring into the holding tank, and do the appropriate dating and labeling. (Ortiz Affidavit ¶ 9.)

10. That simultaneously, Jesse Ortiz, was required to continue the hourly metal checks for his four (4) presses, and the ½ hour checks for weight, hardness, and size. (Ortiz Aff. ¶ 9, Salas Tr. 10-11: 14-15. Johnson Tr. 39:10-15.)

11. That similarly situated Caucasian male, Wes Garlock was only required to run his 2-3 presses, make tablets within specs, send them down a conveyor belt to packaging, and bulk off when needed. Garlock Tr. pp. 11-12, lines 22-29), (Grandberry Tr. 18-19: 14-12.)

12. That Barbara Garlock, white female, following Plaintiff's termination, operated the D-line without the add-on. (Johnson Tr.37-39), (Grandberry, Tr. 19:10-12)

2

13.     That despite Plaintiff's many requests for help with his job; sporadic help was finally provided, just one month prior to his termination.  (Salas Tr.11-12: 16-3, 12:3-22, Grandberry Tr. 43: 7-13).

14.     That Phyllis Grandberry, mints department supervisor since March 2007, was aware that the Plaintiff's workload was vastly disproportionate to that of his comparator, Wes Garlock. (GrandberryTr.18-19: 14-12.)

15.     That when the Plaintiff's wife Sylvia Ortiz, attempted to speak with Wanda McKinnon (Caucasian female) about the Plaintiff's workload, McKinnon stated she was too busy to talk, and immediately, in the wife's presence, welcomed a Caucasian mechanic into her office, with the words, " come on in, I have all the time in the world for you." (Sylvia Ortiz, Aff¶ 8)

16.     That Plaintiff, Jesse Ortiz was involved in a verbal exchange with (Caucasian male) Claude Taylor, mechanic for the Defendant Hershey, when Taylor elbowed the Plaintiff in his ribs.  Plaintiff, who was present in the mints packaging area to provide a work code to another employee, responded. "aren't you going to say excuse me". Thereafter, Taylor again squeezed back through the area stating "I don't want to accidentally hit Jesse in the back", to which Jesse responded " As long as it don't hit you in the face". (Complaint ¶. 5)

17.     That Jesse Ortiz was escorted into McKinnon's office and asked if he made the "as long as it don't hit you in the face" remark, told to shut-up by McKinnon, and "that was all she needed to know."

18.     That Plaintiff was placed on a two-week suspension without pay and upon his return, was again brought into McKinnon's office and told to apologize to Taylor, and "just to let Claude talk" (Ortiz Aff. ¶ 5).

19. That when the Plaintiff attempted to talk, he was told to "just shut-up and listen". (Ortiz Aff. ¶16)

20. That Plaintiff signed a last chance agreement on January 31, 2008.

21. That Plaintiff Ortiz would greet Grandberry in the workplace, while in the company of African American and Caucasian employees, and she would respond by speaking to each employee individually, by name excluding Plaintiff. (Ortiz Affidavit ¶ 6.)

22. That on January 24, 2009, and on May 27, 2009, Plaintiff received written warnings for allegedly mislabeling four (4) drums of *Breathsavers*, and failing to keep his metal detector candy dispense pan empty, respectively.

23. That on March 22, 2010, Plaintiff received a written warning for running Wintergreen Mints and documenting Spearmint in his paperwork.

24. That on August 10, 2010, Jesse Ortiz was terminated when he failed to immediately locate and report a missing wand, when he was forced to attend to a malfunctioning add-on component of his position. (Ortiz Affidavit 17.)

## LAW AND ARGUMENT

Traditionally, federal courts have analyzed Title VII cases where there is no "direct evidence" of discrimination, such as an overt statement by a decisionmaker that the decision was based on a prohibited factor by means of a three-part framework established by the Supreme Court in *McDonald Douglas Corp. v. Green*. Courts employ this burden-shifting analysis to analyze "circumstantial evidence" and decide whether a case should be dismissed or should proceed to trial.

Under this framework the burden first calls to the Plaintiff to establish a prima-facie case by showing that he is a member of a class protected by Title VII, he was qualified for the job, he

4


was the victim of an adverse employment decision and he was treated differently than a similarly situated person not in the protected class.

Second, if the Plaintiff makes the showing, the employer has the burden to articulate a legitimate, nondiscriminatory reason for the challenged employment decision. This is a burden of production, not a burden of proof, so the employer must merely show its belief was genuine, not that the underlying basis for the belief was accurate.

Third, if this burden is met, the Plaintiff has the burden to show that the employer's proffered reason is mere pretext for discrimination. If the Plaintiff comes forward with evidence to meet his burden, the case is not dismissed and may go to trial.

The disparate treatment doctrine, articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) requires a Plaintiff to demonstrate that an employer has treated some people less favorably than others because of their race, color, religion, sex or national origin. The ultimate "factual inquiry" in a Title VII case is "whether the Defendant intentionally discriminated against the Plaintiff." <u>U.S. Postal Service v. Aikens</u>, 460 U.S. 71, 715 (1983). In doing so, the court may take into account the evidence that the parties present to meet their burdens of production. Under the McDonnell Douglas framework, (1) the Plaintiff must establish a prima facie case of racial discrimination; (2) the employee must articulate some legitimate, nondiscriminatory reason for its actions; and (3) the employee must show that the proffered reason is pretextual. <u>Harrison v. Metro. Gov't of Nashville and Davidson County</u>, 80, F 3d 1107, 1115 (6th Cir. 1996.) Under a disparate treatment theory "proof of discriminatory motive is critical. However, in some cases, it may be inferred from the mere fact of differences in treatment." <u>Rowe</u>, 690 F. 2d at 92. Proof of discriminatory motive may also be inferred from

the falsity of the employer's explanation for the treatment. *Reeves v. Sanderson Plumbing Prods,* 530 U.S. 133, 147 (2000).

The burden of establishing a prima facie case of disparate treatment is not onerous. *Texas Dept of County Affairs v. Burdine*, 450 U.S. 248, 253 (U.S. 1981). A Plaintiff may establish a prima facie case of discrimination by showing (1) that he is a member of a protected group,(2) that he was qualified for the position at issue, and (3) that he was treated differently than comparable employees outside of the protected class. *McDonnell-Douglass*, 411 U.S. at 802, *Mitchell v. Toledo Hosp.*, 964 F 2d 577, 582 (6th Cir. 1992).

Summary Judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) and (c). The burden to show that there are no genuine issues of material fact falls upon the party seeking summary judgment. *Celotex Corp. v.Cutrett*, 477 U.S. 317, 322-23 (1986). "Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a Judge. (See Ex. 3 *Bobo v.United Parcel Service*,). In deciding cases on summary judgment, the interpretation of evidence should be read in the light most favorable to the nonmovant. (See Ex. 2 *Handy-Clay)*

## **PROTECTED CLASS**

Jesse Ortiz is a member of a protected class. The Plaintiff, Jesse Ortiz, is a Hispanic (Mexican) American. Ortiz depo. p. 89, lines 17-18.

### **JESSE ORTIZ WAS QUALIFIED FOR THE JOB OF PRESS OPERATOR**

Jesse Ortiz began his employment with Hershey on October 28, 2001, as a press operator. (Love Tr. ¶ 5.) Mr. Ortiz knew more about the presses than any other Hershey employee. (Johnson TR.17-18:20-1). Mr. Ortiz did more work than the other press operators. (Grandberry, p. 45, line 24, Salas, pp 23-23) Mr. Ortiz was an eleven (11) year employee of the Defendant, Hershey Company, and, but for the discriminatory imposition of additional duties, which impacted the terms and conditions of Plaintiff's employment with Hershey as a press operator, discipline, if any, would have been minimal. (Ortiz Aff. ¶ 7, 8)

The record establishes that the Plaintiff was more than qualified for the position of press operator. Taking all evidence in a light most favorable to the Plaintiff, the court must reasonably conclude that Ortiz was qualified for the position of press operator.

### JESSE ORTIZ WAS THE VICTIM OF AN ADVERSE EMPLOYMENT ACTION.

A materially adverse employment action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." A materially adverse employment action might consist of:

1. Termination of employment
2. Decrease in wage or salary
3. Less distinguished title
4. Material loss of benefits
5. Significantly diminished material responsibilities

The determination of whether an employment action is "materially adverse" is a fact-intensive inquiry that must occur on a case-by-case basis. _Arnold v. City of Columbus_, (6th Cir. WL 62847 (Feb. 20, 2013).

In the instant case, Mr. Ortiz was terminated from his employment as press operator for the Defendant. Under all relevant case law, termination is deemed a materially adverse employment action. _Id._

7

**JESSE ORTIZ WAS TREATED DIFFERENTLY THAN A SIMILARLY SITUATED EMPLOYEE NOT IN THE PROTECTED CLASS.**

In <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F 3d 344, 352 (6th Cir. 1998) the appellate court concluded that differences in job activities did not destroy comparator status because such differences do not "automatically constitute a meaningful distinction that explains the employer's differential treatment of two employees." Id at 353. Moreover, the same supervisor criteria is not an inflexible requirement." <u>Seay v. Tennessee Valley Auth.</u> 339. 3d 454, 479-80 (6th Cir. 2003). Whether it is relevant in a particular case that employees dealt with the same supervisor depends on the facts presented. <u>Mcmillian v. Castro</u>, 405 F. 3d 45, 414 (6th Cir. 2005). The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the Plaintiff was the victim of intentional discrimination." <u>Reeves v. Sanderson Plumbing Prods.Inc.</u> 530 U.S. 133, 153 (2000). It is herein reiterated that discriminatory motive may be inferred, in some cases, from the mere fact of differences in treatment.

In the instant case, Jesse Ortiz (Mexican-American) and Wes Garlock (Caucasian-American) migrated from Holland, MI, to work in the mints department at Hershey. Mr. Ortiz began his employment as a press operator in October 2001, and Mr. Garlock began as press operator, at Hershey, on December 10, 2001. Both men shared the same succession of supervisors, they were: James Hawkins, Bryan Tate, Mike Bernot and Phyllis Grandberry. (Garlock p. 8, lines 17-19, p. 9, lines 18-20. Ortiz Aff. ¶ 2.) Garlock and Ortiz were first shift press operators initially on "B" and "C" [1](Garlock, p. 10, lines 20-24). When the "C" line ceased production, Ortiz assumed operation of the "D" line. All of the lines (A,B, D) ran at the same production speed and the goal of the mint department employees was to produce quality mints of

---

[1] Angelica Salas, Hispanic –American, press operator, operated the "A" line.

specific weight, size, and hardness. The beginning salary for the mint department press operators was approximately $15.75 per hour. (Garlock, Tr. 9:6.). Garlock moved from the mints department at Hershey to its mechanics department in June 2010. Plaintiff, Jesse Ortiz was terminated on August 10, 2010. Both employees earned approximately $19.70 per hour at the conclusion/ termination, respectively, of his employment in the mints department at Hershey. (Garlock Tr. 20:2-4).

Under § 703 (a)(1) of Title VII, it is unlawful for an employee "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. §2000 (E) – 2(A)(1) (2000).

In the case at issue, Plaintiff performed twice the workload of Wes Garlock as press operator for Hershey, yet he was held to the same hourly quality checks, immediate reporting requirements, and less room for error by Plaintiff, than similarly situated press operators, despite having to do twice the work of similarly situated non-Hispanic employees (Ex.1). In other words, Garlock performed one (1) metal detector check per hour, whereas, Ortiz was required to perform two (2) metal detector checks per hour, one as the press operator, and the other as the add-on operator. Wes Garlock ran two (2) to three (3) presses, and Ortiz ran four (4) presses. Yet, if a wand was lost Jesse Ortiz was penalized when the add-on responsibilities prevented immediate reporting to his supervisor. But for the discriminatory difference in the terms and conditions of Plaintiff's employment, he would have been afforded the same time to discover, prevent, or timely report infractions as similarly situated press operators (Ex.1). Garlock's 2-3 presses, did not fill, the 335 lb. barrels as rapidly as the Plaintiff's four (4) presses, resulting in fewer balk offs for Garlock. Garlock, due to a substantially lighter

workload, was better equipped to retrieve wands when lost; to devote more concentration to the correct labeling of drums, and generally to perform in a more focused arena, than the Plaintiff. The discrimination was in the terms and conditions of Plaintiff's employment with Hershey, in that he was treated less favorably than a similarly situated Caucasian press operator, and the discrimination in those terms and conditions resulted in the Plaintiff's termination when it negatively impacted his quality of work. (Ortiz Aff. ¶ 27.) Additionally, evidence which tends to bespeak discrimination is that Barbara Garlock (Caucasian Female) currently runs D-line without an add-on, as did all other non-Hispanic employees. (Ortiz Aff.¶ ¶28,11,8.).

## AFRICAN AMERICAN GARY JOHNSON

Gary Johnson, African American, is a back up press operator for Hershey Company. (Johnson, Tr. 8: 2.) As back up press operator, Johnson filled in for press operators on the day shift when he or she was absent. (Johnson, Tr.9:12-24.) Mr. Johnson has been in the position of back up press operator for 6-7 years. (Johnson, Tr.10: 1-3.) Phyllis Grandberry is his supervisor. (Grandberry, 37, lines 6-20.) Gary Johnson is in all relevant respects similarly situated to Ortiz.

When Johnson operated the press on the D line in Plaintiff's absence, he simply cut the presses off. (Johnson Tr.39: 10-15.) In fact, evidence was provided to the EEOC investigator that Johnson was issued a written warning in August 2010, for failing to notice dark green spots on a product. EEOC 000006.

On May 4, 2013, Johnson testified as follows:

Q. When you operated as a fill-in for Wes Garlock or Jesse Ortiz or Angie Salas, were your responsibilities and duties essentially the same?
A. Yes.
Q. Was the supervisor the same ---
A. Yes.
Q. --- for all lines?
A. Yes.
Q. And who was that supervisor?
A. Phyllis Grandberry.
Q. Have you ever – since your employment at the Hershey plant last – have you ever received a written reprimand or oral reprimand?
MS. GUERRASIO: Objection. You can answer.
A. Yes
Q. (BY MS. GARNER) Which one, the written or the oral?
A. Oral.
Q. And when did you receive an oral reprimand?
A. About two months ago.
Q. And what was that for?
A. Failure to --- failure to complete my documents, incomplete documents.
Q. And was that in your duty as press operator?
A. Yes.
Q. What is it that you did not complete?
A. I left my name off a document.
Q. And that was an oral reprimand? It didn't impact your salary or ---
A. No.
Q. --- you weren't suspended or anything; correct?
A. Correct.
MS. GUERRASIO: Objection. You can answer.
Q. (BY MS GARNER) Any other reprimands?
A. No.
Q. That's the only reprimand you've had since your employment with Hershey?
A. That I can remember.

11

Further, Ms. Grandberry testified, that Johnson received "write-ups" for paperwork violations only. (Grandberry Tr. 37-39.)

It is submitted that there is ample evidence in the record, from which reasonable jurors can infer that Mr. Ortiz was intentionally discriminated against in the terms and conditions of his employment with Hershey.  Drawing all inferences in the light most favorable to Ortiz, precludes summary judgment in this cause. The differences in treatment in this case begs the court to infer intentional discrimination.

### DEFENDANT'S ARTICULATED REASON FOR PLAINTIFF'S TERMINATION IS PRETEXTUAL

The Defendant has produced various written disciplines against the Plaintiff, most of which relate to quality of work.

| Exhibit Number | Violation | Date Signed |
|---|---|---|
| 1 | Bypasses a safety guard to lubricate punches while machine running. | 2/7/2003 |
| 2 | Not checking the metal detector hourly | 9/11/2007 |
| 3 | Wand missing. (Related to add-on, not press operator) | 8/20/10 |
| 4 | Altercation with Claude Taylor | 1/29/2008 |
| 5 | Mislabeling of *Breathsaver* mints. | 1-24/2009 |
| 6 | Ran Spearmints, but wrote wintergreen on paperwork | 3/22//2010 |
| 7 | Failing to keep metal detector pan empty. | 1/5/2009 |

All alleged violations, with the exception of the altercation with Claude Taylor can be directly attributable to the Defendant's discriminatory treatment of the Plaintiff in the terms and conditions of his employment.  But for the discrimination, the Plaintiff would have had the same opportunity as his comparator and other employees to catch and rectify his mistakes.

In order to meet its burden, the Defendant must articulate a <u>legitimate, nondiscriminatory</u> reason for its termination of the Plaintiff.  As press operator, the Plaintiff herein, was assigned the dubious job/ tasks of two (2) men.  In making the discriminatory assignment, the Plaintiff was deprived of the necessary time to perform his job at peak.

There are no hard and fast rules as to …what evidence is needed in order to establish a pretext. <u>Rowe</u>, 690 F. 2d at 97.  The test is whether there is reasonable evidence in the record to support a finding of pretext.

Once a proferred reason is found to be pretextual, a court may infer the ultimate fact of intentional discrimination. <u>Kline v. Tenn Valley Authority</u>, 128 F 3d 337 (6th Cir. 1997).

The Defendant articulates the various quality control violations. It is submitted that the articulated reason its roots in the Defendant's discrimination it the terms and conditions of Plaintiff's employment.  The Plaintiff was treated less favorably than no n-Hispanic press operators in the terms and conditions of his employment with Hershey.  The less favorable treatment exposed the Plaintiff to a greater risk of error.

## CONCLUSION

Reviewing all of the evidence favorable to Ortiz, a reasonable jury could logically infer that the assignment of the Plaintiff to a two man job was race motivated.

Reviewing all of the evidence favorable to Ortiz a reasonable jury could logically infer that but for the discriminatory assignment of the Plaintiff to a two-man job, his ratio of error would have been equal to similarly situated press operators.

As such, this case should proceed to trial.

                                        Respectfully submitted,

                                        <u>s/ Linda K. Garner</u>
                                        Linda K. Garner 13573