

Ex. 3

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0006p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

WALLEON BOBO,
       *Plaintiff-Appellant,*

v.

UNITED PARCEL SERVICE, INC.,
       *Defendant-Appellee.*

No. 09-6348

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 08-02238—Jon Phipps McCalla, Chief District Judge.

Argued: June 8, 2011

Decided and Filed: January 9, 2012

Before: DAUGHTREY, MOORE, and STRANCH, Circuit Judges.

---

## COUNSEL

**ARGUED:** Luther Oneal Sutter II, HARRILL & SUTTER, P.L.L.C., Benton, Arkansas, for Appellant. Waverly D. Crenshaw, Jr., WALLER LANSDEN DORTCH & DAVIS, LLP, Nashville, Tennessee, for Appellee. **ON BRIEF:** Luther Oneal Sutter II, HARRILL & SUTTER, P.L.L.C., Benton, Arkansas, Andrew C. Clarke, Memphis, Tennessee, for Appellant. Waverly D. Crenshaw, Jr., Stanley E. Graham, William T. Fiala, WALLER LANSDEN DORTCH & DAVIS, LLP, Nashville, Tennessee, for Appellee. Justin S. Gilbert, GILBERT RUSSELL McWHERTER PLC, Jackson, Tennessee, for Amicus Curiae.

---

## OPINION

---

    JANE B. STRANCH, Circuit Judge. Walleon Bobo appeals the district court's grant of summary judgment in favor of United Parcel Service, Inc. (UPS) on Bobo's discrimination and retaliation claims brought under the Uniformed Services Employment

and Reemployment Rights Act (USERRA) and his race discrimination and retaliation claims brought under 42 U.S.C. § 1981, Title VII, and the Tennessee Human Rights Act (THRA). We **AFFIRM** the grant of summary judgment on the retaliation claims brought under § 1981, Title VII, and THRA, but we **REVERSE** and **REMAND** for trial on the remaining claims.

## I. FACTS

Bobo is an African American who began his career at UPS in 1987 and worked his way up through the hourly ranks. He was also a longstanding member of the Army Reserve and a combat veteran. In late June 2004, after completing rehabilitation for an injury sustained in Iraq, Bobo returned to his employment as a supervisor at the UPS Oakhaven facility in Memphis, Tennessee.

When Bobo subsequently presented a copy of his military orders for annual training, Bobo's manager, Dennis Langford, told Bobo that he needed to choose between UPS and the Army. A co-worker also warned Bobo that UPS did not want its supervisors to serve in the military reserves and that he should expect harassment about his military service. Bobo complained about Langford's remark in an email he sent to Bob Wagner, a Caucasian who served as Transportation Services Division Manager for the Mid-South District. The record does not appear to include a copy of this email or any written response Wagner may have made to it. UPS apparently allowed Bobo to take the requested leave.

In late 2004 UPS certified Bobo for the position of on-road feeder supervisor to train and supervise UPS drivers. Bobo reported to Norman Morton, who is African American. Morton in turn reported to Bob Wagner.

In March 2005, Bobo received military orders for annual training in June. He provided a copy of the orders to Morton, who asked Bobo if his military service was voluntary or involuntary. Morton later provided a written statement to Wagner in which he admitted that he "did not want Walleon volunteering for additional military duty when he was needed at UPS." (Bobo Aff. Ex. 1 at 1-2.) Wagner signed and dated

Morton's statement to indicate that he had read it. Bobo claims he had several conversations with Morton and Wagner about his requests to take time off for military duty. Bobo requested a letter explaining UPS policy on allowing supervisors to take leave for military duty, but he did not receive such a letter.

After Bobo returned from military training, Morton assigned Bobo eleven drivers to train between July and November 2005, while during the same period he assigned each of Bobo's peers four drivers to train. One of the drivers assigned to Bobo was Sharon Thompson, an African American female. Bobo avers that Morton instructed him to disqualify Thompson, no matter how well she performed. Troubled by this demand, Bobo did not disqualify Thompson. As a result, Bobo believed that he was harassed for not following a plan to discriminate against Thompson.

Bobo asserts that, in January 2006, Morton assigned him to supervise eighty-three drivers, while the Caucasian feeder supervisors who had not taken leave for military duty were assigned to supervise forty-one drivers each, and the only other African American feeder supervisor was assigned to supervise forty-six drivers. During a meeting with Morton and Wagner, Bobo asked why he was assigned to supervise so many drivers. Morton told him, "[D]on't worry about it. Get your friends to help you." (Bobo Depo. at 87, 89.) UPS disputes Bobo's assertion that he carried a supervisory load twice as heavy as his peers and suggests that charts showing Bobo was assigned to supervise two large groups of drivers were incorrect due to a simple typographical error.

As an on-road feeder supervisor, Bobo was required to conduct a "safety ride" with each driver under his supervision at least once a year and following accidents. A safety ride ordinarily required a full workday to complete. Bobo was trained to observe the driver's safety performance, personally demonstrate safe driving techniques, coach the driver on best practices, complete a comprehensive Record of Safety Ride form to document the topics covered during the safety ride, and have the driver sign the completed form to confirm that the safety ride was done and that the driver understood the instructions given. In Wagner's view, a feeder supervisor could not properly complete safety ride training or safety ride forms by observing a driver while he operated

equipment only on UPS property. Bobo contends that feeder supervisors routinely conducted safety rides on UPS property.

Between February and September 2006, the Oakhaven feeder department failed to complete driver safety rides in a timely manner due to a lack of trained supervisors. During this period, UPS management permitted half-day safety rides as long as supervisors completed all of the necessary training, but permission to conduct half-day safety rides did not give supervisors license to falsify safety ride forms, fail to conduct complete safety rides, or request that drivers sign incomplete forms. Bobo contends that UPS was concerned about passing audits during this period. As a result, high-level managers instructed supervisors to document that they provided at least one hour of supervisor demonstration time during each safety ride, even if the statement was not true. Further, managers instructed supervisors to vary the amount of demonstration time over one hour that was documented on safety ride forms.

In March 2006, Bobo provided to UPS a copy of his military orders for annual training and requested twenty-two days of leave in June and July. UPS allowed Bobo to take the leave. Under company policy, Bobo's compensation should have been suspended temporarily because Bobo received military salary and benefits during military duty; however, UPS inadvertently continued to pay Bobo's salary while he was receiving military pay. When UPS discovered the overpayment in August 2006, it prepared a schedule of payroll deductions to recoup $6,000 from Bobo's salary between September and December 2006. Bobo claimed that UPS deducted too much money from his salary to retaliate against him for taking leave to attend military training. Bobo asked Wagner if he treated Arthur Shumway the same way he treated Bobo. Shumway was a Caucasian feeder supervisor who was not a member of the military reserve. According to Bobo, Shumway often worked less than four hours a day and conducted private business on company time, yet he drew a full UPS salary. Wagner was upset by Bobo's question.

In early January 2007, Bobo notified Fred Flenorl, an African American driver, that his annual safety ride was overdue. Because Flenorl's work attendance was

generally poor, Bobo had difficulty communicating with Flenorl. Bobo asserts that he gave Flenorl the opportunity to participate in a full safety ride, but Flenorl would only agree to a shortened safety ride. In March 2007, Bobo observed Flenorl's driving on UPS property and orally examined him for fifteen minutes about the safety ride topics. Bobo asked Flenorl to sign a partially completed safety ride form, and Bobo documented that a full safety ride had occurred, including one hour and twenty minutes of supervisor demonstration time. In April 2007, Flenorl complained to UPS Security that Bobo directed him to sign a blank safety ride form. Bobo contends Flenorl's complaint was prompted by a disciplinary warning letter he gave to Flenorl two days earlier.

As a result of Flenorl's complaint, UPS launched a department-wide investigation into the falsification of safety rides. UPS Security Investigator Ronald Barrett and Security Supervisor Orlando Croft, both of whom are African American, conducted the investigation. On May 10, 2007, Barrett interviewed Bobo, who admitted that he observed Flenorl's driving only on UPS property and that he asked Flenorl to sign an incomplete safety ride form. During his interview, Flenorl denied that Bobo observed his driving at all. He alleged that Bobo asked him to sign a blank safety ride form in February 2007 and instructed him not to date the form. Based on Flenorl's statement and Bobo's admissions, Barrett recommended that management remove Bobo from service pending further investigation.

During this litigation, Flenorl provided an affidavit favorable to Bobo. He swore that, shortly before he filed the complaint against Bobo, Caucasian feeder supervisors, including David Pendleton, asked him on multiple occasions whether Bobo had given him a safety ride. Flenorl believed that UPS was "after someone" and likely him because Wagner had fired him several times previously, only to reinstate him. To deflect attention from himself, Flenorl filed the complaint against Bobo. Flenorl averred that it was widespread practice for feeder supervisors to ask drivers to sign blank safety ride forms. Pendleton and Chris Wheeling, also a Caucasian feeder supervisor, had asked Flenorl to sign blank safety ride forms.

Barrett and Croft interviewed every employee in the Oakhaven feeder department. They uncovered evidence that Bobo falsified other drivers' safety ride forms. When questioned again, Bobo admitted that he instructed drivers Tim Swindle and Dennis Rowe to sign incomplete forms and that he falsified their forms to make it appear that he rode with them from Memphis to Albuquerque when he actually rode with them only a few miles. When interviewed by the investigators, Pendleton denied that he falsified safety ride forms. He provided UPS with a written statement denying any misconduct.

UPS terminated Bobo's employment on May 22, 2007, for violation of the company integrity policy. Bobo's discharge occurred two weeks before his scheduled annual military training. Six high-level managers from the Mid-South District jointly decided to discharge Bobo: Wagner; Bob Cowan, Operations Manager; Mike Speraw, Security Manager; Jon Robertson, Human Resources Manager; Jim Smith, District Manager; and Carolyn Walsh, Vice President of the West Region. Although Bobo was given the option to resign, he refused to do so.

During an exit interview with Wagner and Robertson, Bobo again admitted that he falsified safety ride forms, but he insisted that, if UPS was going to fire him for falsifying forms, then every feeder supervisor should be fired. Bobo emphasized that UPS management knew there was a widespread custom of conducting safety rides as Bobo had conducted them, and every supervisor, on at least one occasion, had not actually performed the length of demonstration time recorded on a safety ride form. Bobo reported that he saw Pendleton ask a driver to sign a blank safety ride form, and the driver complied. Bobo also disclosed that, on more than one occasion, at Pendleton's request, Bobo asked drivers assigned to Pendleton to sign blank safety ride forms. Bobo then gave the forms to Pendleton, who later completed them and turned them in.

Bobo further claimed that, in early April 2007, Oakhaven feeder department manager Jeff Hauss instructed him to complete a safety ride with Randy Cain. Bobo asked Hauss if he should travel to Mississippi to perform a full safety ride with Cain. Hauss instructed Bobo to conduct a safety ride with Cain on UPS property in Memphis.

No. 09-6348   *Bobo v. United Parcel Service, Inc.*   Page 7

Bobo admitted that he falsified the form by showing that a full safety ride took place and by indicating that he provided one hour and five minutes of demonstration time.

The investigators' final report, dated May 31, 2007, listed numerous instances of improperly completed safety rides and possible falsification of safety ride forms at the Oakhaven facility. The report stated that Morton, Hauss, and Wagner at times approved of irregular conduct concerning safety rides. Wagner denied, however, that UPS Security informed him about feeder supervisors falsifying records.

In October 2007, five months after Bobo's discharge, UPS Security received a report that feeder supervisor Ronnie Wallace, a Caucasian, falsified safety ride forms. When interviewed, Wallace, like Bobo, admitted that he falsified forms. UPS gave Wallace the option to resign or be fired, and Wallace chose to resign. UPS contends that Wallace is the only feeder supervisor similarly situated to Bobo because both Wallace and Bobo admitted misconduct and both lost their jobs.

Bobo claims that he was fired because of his commitment to military service, which required him to be absent from work, his race and his opposition to unlawful discrimination. He believes UPS could have imposed discipline short of discharge, such as denying him pay raises and stock options, placing him on probationary status, or removing him from service without pay for a period of time.

Bobo further contends that Pendleton and Brad Jordan, both Caucasians who were not in the military reserve, received better treatment than he did because they falsely denied misconduct during the safety ride investigation. Bobo also claims that he is similarly situated to Myles Spears, a Caucasian who was the former UPS Center Manager at Fort Smith, Arkansas. After falsifying an audit document, Spears was demoted to feeder supervisor. Bobo pointed out that he and Spears both worked at UPS for many years, neither had been disciplined previously, and both served under the same high-level chain of command in the Mid-South District. Yet, Spears received preferential treatment because his direct supervisor saved his job. UPS denies that Wagner supervised Spears or that Wagner knew Spears falsified documents. UPS also contends that Bobo cannot compare himself to Spears because there was no

management-level position below feeder supervisor to which Bobo could have been demoted, and UPS does not demote supervisors to hourly bargaining unit positions.

In support of his legal claims, Bobo relies heavily on the testimony of Bob Cowan, the second-highest manager in the Mid-South District. During deposition, Bobo's attorney confronted Cowan with Morton's remark that he did not want Bobo volunteering for additional military duty when he was needed at UPS. Cowan characterized Morton's comment as "absolutely inappropriate" and a violation of UPS policy. Cowan also acknowledged that Kent Hardy, a Caucasian supervisor, falsified time cards in violation of federal law, but he was not discharged. Cowan further expressed concern about a technique Barrett used when he interviewed Pendleton about falsifying safety ride forms. Barrett told Pendleton that he could prove Pendleton falsified safety ride forms. Cowan testified that, if Barrett in fact had such proof about Pendleton's conduct, Cowan wanted to know about it. If Barrett did not have such proof, then Barrett, too, committed a violation of the UPS integrity policy by lying to Pendleton. Cowan admitted that some of the information he learned for the first time during his deposition raised questions he would want answered.

Cowan further testified that in agreeing to discharge Bobo, he relied on the information uncovered during the safety ride investigation and on information Wagner gave him about Bobo and, had he been provided with additional information, he might have suggested a course of action other than termination of Bobo's employment.

Due to the loss of his UPS employment, Bobo was forced to retire as a Lieutenant Colonel in the Army Reserve so that he could accept a position as a Junior ROTC instructor for Memphis City Schools. Bobo can no longer serve on active military duty.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) & (c).

No. 09-6348     *Bobo v. United Parcel Service, Inc.*                    Page 9

The burden to show that there are no genuine issues of material fact falls upon UPS as the party seeking summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). We consider the evidence presented in the light most favorable to Bobo and we draw all justifiable inferences in his favor. *Id.* The ultimate question before us is whether the evidence presents a sufficient factual disagreement to require submission of a particular legal claim to the jury or whether the evidence on the claim is so one-sided that UPS should prevail as a matter of law. *See id.* at 251-52.

## III. ANALYSIS

In resolving this appeal, we first consider Bobo's argument that the actions of UPS and the district court during litigation of the case unfairly precluded him from presenting additional facts in support of his claims. We agree with Bobo that the district court improperly restricted the scope of discovery when it allowed UPS to determine unilaterally that the only Caucasian, non-military supervisor who was similarly situated to Bobo was Ronnie Wallace. We also conclude that the district court unduly delayed its ruling on Bobo's discovery motions until after the court had already granted summary judgment for UPS. The discovery errors alone convince us that the summary judgment in favor of UPS cannot stand, but we also conclude that the record demonstrates genuine issues of material fact for trial. As explained in more detail below, we reverse the grant of summary judgment in favor of UPS on most of Bobo's claims and remand the case to the district court with instructions.

### A. Discovery background

The district court imposed a discovery deadline of March 1, 2009. Two days before the deadline, Bobo filed a motion to compel and a motion to extend the discovery deadline, which UPS opposed. The gravamen of the discovery dispute was two-fold. First, Bobo asked the district court to compel UPS to provide a wider scope of discovery

No. 09-6348        *Bobo v. United Parcel Service, Inc.*        Page 10

in response to his written discovery requests, which sought information about several Caucasian, non-military supervisors to whom Bobo compared himself. Second, Bobo proposed an extension of the discovery deadline to allow him to depose more than fifty additional witnesses.

In response to Bobo's written discovery requests, UPS identified Ronnie Wallace as the only Caucasian, non-military feeder supervisor whom UPS considered to be similarly situated to Bobo. Although UPS provided discovery about Wallace, it declined to provide discovery about other potential comparators because it asserted such discovery was "not relevant" under *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). UPS also pointed out that courts routinely limit discovery to those persons in an employee's division or chain of command; therefore, UPS claimed that it was required to provide discovery only concerning comparable supervisors under Bob Wagner's oversight.

The magistrate judge denied Bobo's discovery motions on May 27, 2009, expressly finding that UPS had "appropriately complied with Plaintiff's discovery request[s] by providing information [about] the sole employee [who] qualifie[d] as a comparator under *Mitchell*." R. 44, Order at 3. The magistrate judge also found no good cause to extend the discovery deadline to permit Bobo to take more depositions. *Id.* at 4.

Two days after entry of the discovery order, on May 29, UPS moved for summary judgment in accordance with the dispositive motion deadline set forth in the scheduling order. On June 4, Bobo filed objections to the discovery order, and on June 5 he filed a "Rule 56(f) Motion,"[1] explaining how the discovery order adversely impacted his ability to respond to the summary judgment motion. UPS opposed both motions. Inexplicably, the district court did not timely rule on Bobo's objections or his Rule 56(f) motion.

---

[1] The 2010 amendment to Rule 56 moved former subsection (f) to subsection (d). To maintain consistency with the district court record, all references hereafter will be to Rule 56(f).

No. 09-6348        *Bobo v. United Parcel Service, Inc.*                Page 11

On June 26, Bobo filed a response to the summary judgment motion, providing in support his own affidavit, Flenorl's affidavit, excerpts from Cowan's deposition, excerpts from the depositions of Cowan and Eddie Roach[2] taken in *Weston v. UPS*, No. 6:08cv6061 (W.D. Ark.), three "Statements Under Oath,"[3] and excerpts from an uncompleted deposition of Naaman Kelley, a feeder department dispatch supervisor in Little Rock, Arkansas, that was taken on June 23, 2009, in *Haynes v. UPS*, No. 2:09cv01250 (W.D. Tenn.).[4] UPS filed its reply brief on July 22.

The next day, on July 23, the district court heard telephonic oral argument on the summary judgment motion. On the following day, July 24, Bobo filed the transcript of the suspended Kelley deposition and asked the district court for permission to complete the deposition. Bobo represented Kelley would testify that, during a post-audit meeting with other high-level Mid-South District managers, Wagner blamed Bobo's frequent military service as the reason why Oakhaven was always behind on completing safety rides. UPS filed a response to Bobo's request to complete the deposition. The district court did not rule on Bobo's request.

At the pretrial conference on August 17, the district court indicated an intent to grant summary judgment for UPS, but noted, "I've been putting this off hoping that I would be able to reach a different conclusion." R. 110 at 4. The court invited further argument because it was bothered by two aspects of the case. First, the court was concerned about the direct evidence that UPS supervisors discouraged Bobo from

---

[2] Roach was the current HR manager for the Mid-South District. He testified that Myles Spears admitted to him that he falsified an audit document, but Spears was not fired because he was "a good partner" and he served many years with the company without receiving any prior discipline. R. 56-8 at 7-10.

[3] Bobo's counsel took the "Statements Under Oath" of Rodel Diggins, Keitha Barnes, and Jesse Hughes in question-and-answer format before a court reporter without UPS counsel present. We need not resolve the parties' dispute about whether these statements constitute affidavits or *ex parte* depositions because we do not rely on these statements to support the conclusions we draw in this opinion.

[4] Kelley testified that he attended division-level meetings with Wagner and other managers following national feeder audits. During the meetings, the participants discussed Oakhaven's practice of giving drivers partial safety rides. When Bobo's counsel asked Kelley what Wagner said during those meetings about Oakhaven's practice, UPS objected and instructed Kelley not to answer on the ground that discovery in this case was closed. During the deposition, counsel for the parties contacted Magistrate Judge Pham in the Western District of Tennessee, who suspended Bobo's questioning of Kelley pending receipt of briefs on whether the discovery should be allowed.

military service. Second, the court was concerned that Bobo admitted his misconduct and lost his job, while other feeder supervisors likely did not tell the truth and retained their jobs. *Id.* at 5, 15. After hearing further argument, on September 2 the court issued its decision granting summary judgment for UPS without ruling on Bobo's objections to the discovery order, the Rule 56(f) motion, or the request to complete Kelley's deposition.

Bobo moved to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), specifically requesting rulings on his outstanding objections and motions. After receiving UPS's response to the Rule 59(e) motion, the district court denied it, holding that the magistrate judge's order limiting discovery to Ronnie Wallace, the only similarly-situated supervisor as defined by UPS, was not a clearly erroneous decision and fell within Sixth Circuit precedent, citing *Mitchell*, 964 F.2d at 583, and *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006). The court further ruled that there was no indication UPS knew of any employees besides Ronnie Wallace who were employed in a similar position, worked for the same supervisor, and committed the same improper conduct. The district court declined to modify the discovery order to allow more depositions, but the court indicated it might have reached a different decision on that request. Finally, the court denied the Rule 56(f) motion on the ground that Bobo had sufficient time to conduct discovery and respond to the summary judgment motion, and the Rule 56(f) motion could not be used to circumvent the discovery order.

## B. Reversal of the discovery and post-judgment orders

We are troubled by both the procedural and substantive treatment of this case. We long ago clarified that courts should not assume "the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). In *Ercegovich*, we concluded that differences in job activities did not destroy comparator status because