such differences do not "automatically constitute a meaningful distinction that explains the employer's differential treatment of the two employees." *Id.* at 353. The key word in *Ercegovich* is "relevant" and the case instructs that the factors listed in *Mitchell* or other cases are only apposite where they are meaningful to the particular claim of discrimination presented.

Contrary to the holding below, Bobo was not required to demonstrate an exact correlation between himself and others similarly situated; rather, he had to show only that he and his proposed comparators were similar in all relevant respects, *id.* at 353, and that he and his proposed comparators engaged in acts of comparable seriousness. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (citing *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (conduct must be similar in kind and severity). While *Mitchell* stated that similarly-situated employees must have dealt with the same supervisor, we later explained that the inquiry "does not automatically apply in every employment discrimination case." *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005). Moreover, we have never read "the 'same supervisor' criterium" as an "inflexible requirement." *Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 479-80 (6th Cir. 2003). Whether it is relevant in a particular case that employees dealt with the same supervisor depends on the facts presented. *McMillan*, 405 F.3d at 414. Thus, the focus of the litigation is not on a comparison of "the employment status of the plaintiff and other employees in every single aspect of their employment." *Ercegovich*, 154 F.3d at 352. As the Supreme Court explains, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000).

We turn to the application of these standards to our facts. Bobo compared himself to several UPS supervisors who were Caucasian and not members of the military reserves. Had Bobo received an opportunity for discovery on these comparators, a jury might have found them similarly situated. David Pendleton and Brad Jordan, feeder supervisors at the Oakhaven facility in Memphis, and Danny Clark and Don Culpepper,

feeder supervisors in Little Rock, Arkansas, were accused of falsifying safety rides but, unlike Bobo, they were not discharged. Bobo also identified Myles Spears, Kent Hardy, and Art Shumway, all of whom apparently violated the UPS integrity policy through various acts of dishonesty, but none of whom were discharged. Bobo also presented evidence that the decisions to terminate his employment, but to retain Pendleton, Jordan, Clark, Culpepper, Spears, Hardy, and Shumway, were made by the same high-level managers in the Mid-South District, including Wagner, Cowan, Robertson, Smith, and Walsh.

Despite Bobo's written discovery requests seeking information about his proposed comparators, UPS refused to provide discovery on these individuals and instead provided discovery only on Ronnie Wallace, a single comparator of its own choosing. The district court's discovery order ratified UPS's position. Thus, the discovery order effectively blocked Bobo from obtaining relevant and potentially admissible evidence on a critical element of his case—evidence necessary to convince a jury that there were supervisors besides Wallace who were similarly situated to Bobo in all relevant respects and yet received better treatment than Bobo because they did not take time off for military service or were of a different race.

The district court's "framing of the similarly-situated standard [was] too narrow and necessitate[d] an exact correlation not required by the law of this circuit." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008). Also, by limiting discovery on other potential comparators, the district court improperly narrowed Federal Rule of Civil Procedure 26(b)(1), which provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim[.]"

In *Clay v. UPS*, 501 F.3d 695, 711-12, 716 (6th Cir. 2007), we considered UPS's failure to turn over discovery in two instances: (1) certain bid sheets that could have been used to show one plaintiff and the proposed comparators were similarly situated; and (2) attendance records that a second plaintiff could have used to show that he and proposed comparators engaged in acts of comparable seriousness. The district court granted summary judgment against both plaintiffs without requiring UPS to turn over

the records in question. This Court reversed, ruling that the district court should have drawn adverse inferences against UPS for failing to disclose the bid sheets and the attendance records. *Id.* The Court stated that "Clay should not be punished for his inability to point to the relevant comparators in this case[,]" because the "'general rule is that [w]here relevant information . . . is in the possession of one party and not provided, then an adverse inference may be drawn that such information would be harmful to the party who fails to provide it.'" *Id.* at 712 (quoting *McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 632-33 (6th Cir. 2000)). Drawing the adverse inferences against UPS on appeal, the Court concluded that each plaintiff established a *prima facie* case of discrimination and, because the plaintiffs pointed to evidence from which a jury could infer that UPS's proffered reasons for the employment decisions were pretextual, the Court reversed the grant of summary judgment on the disparate treatment claims. *Id.* at 713, 717.

Discrimination cases frequently turn on whether the plaintiff can identify one or more comparators who are similarly situated in all relevant respects. The cases we have cited grapple with the difficulty of applying the "similarly situated" comparator standard and the danger of treating that standard as requiring exact correlation, in violation of our precedents. *Clay* and this case also point to the problems inherent in allowing a defendant to control the designation of comparators by simply refusing to provide requested comparator evidence except as to those persons it selects. *See Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 25, 28-29 (D.C. Cir. 1997) (reversing summary judgment and remanding for further discovery where employment discrimination plaintiff requested, but did not receive, comparator data). The refusal of a defendant to disclose requested comparator information denies plaintiff the opportunity to determine whether the evidence actually reveals comparator status and different treatment, critical elements of the claim that the trier of fact must determine. *See Culwell v. City of Fort Worth*, 468 F.3d 868, 873–74 (5th Cir. 2007) (holding Rule 56(f) motion should have been granted where plaintiffs sought comparator information, discovery was in defendants' sole possession, and such evidence could create genuine issues of material fact for trial on whether comparators were similarly situated, as well as on pretext).

No. 09-6348        *Bobo v. United Parcel Service, Inc.*                Page 16

An improper denial of discovery occurred here. Bobo's claims related to discrimination and retaliation based on his military service and race, and he requested discovery on a small number of specific individuals outside each of those protected categories whom he alleged violated the UPS integrity policy by falsifying forms *or* other acts of dishonesty and were treated differently. UPS refused to provide discovery on any of the seven persons Bobo claimed violated the policy yet were retained by the same high-level managers in the Mid-South District. The only comparator on whom discovery was provided was the individual who lost his job for admittedly falsifying forms, five months *after* Bobo was fired.

In light of the above, we conclude that the discovery order was contrary to law and should have been set aside by the district court. Fed. R. Civ. P. 72(a). The district court's unexplained delay in ruling on Bobo's objections to the discovery order unfortunately compounded the error. We also conclude that the district court should have considered favorably Bobo's Rule 56(f) motion because it was tied to his objections to the discovery order. *See Resolution Trust Corp. v. North Bridge Assoc., Inc.*, 22 F.3d 1198, 1208 (1st Cir. 1994) ("When Rule 56(f) functions properly, it ensures that, in the mine-run of cases, a litigant who fails to answer potentially relevant discovery requests on schedule will be unable to demand summary judgment until after he remedies his failure.")

Accordingly, we reverse the discovery order. R. 44. We also reverse the district court's post-judgment order affirming the discovery order and denying the Rule 56(f) motion. R. 99. We remand the case to the district court to re-evaluate Bobo's discovery requests. *See Stella v. Mineta*, 284 F.3d 135, 147 (D.C. Cir. 2002) ("Having corrected the standard pursuant to which the District Court must evaluate [the] prima facie case, we remand so that the District Court may determine whether further discovery" is necessary in light of Rule 56(f) motion); *Farmer v. Brennan*, 81 F.3d 1444, 1450-51 (7th Cir. 1996) (reversing and remanding where district court granted defendants' summary judgment motion without providing plaintiff adequate opportunity for discovery requested in timely Rule 56(f) motion); *Garrett v. City and Cnty. of San Francisco*, 818

F.2d 1515, 1519 (9th Cir. 1987) (reversing and remanding because trial court failed to exercise its discretion when it granted summary judgment before ruling on Rule 56(f) motion).

On remand we instruct the district court to grant Bobo's motion to compel UPS to provide appropriate discovery in response to Bobo's written discovery requests for information on proposed comparators other than Ronnie Wallace. We also instruct the district court to decide whether any additional depositions are warranted. While we do not condone Bobo's decision to wait until two days before the discovery deadline to request numerous additional depositions, we will not preclude him from demonstrating to the district court that certain additional depositions are necessary. Finally, it does not appear that the court ever addressed Bobo's request to complete the Kelley deposition. We return the issue for the court's determination in light of the parameters established herein for continuing discovery, including the request to take Kelley's deposition in this litigation. Although we reverse the judgment primarily because of discovery and procedural error, we also conclude that Bobo presented sufficient facts in opposition to summary judgment to warrant a jury trial on his claims.

### C. USERRA claims

USERRA was enacted to prohibit discrimination against individuals because of their military service. *Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 517 (6th Cir. 2009) (per curiam); *Curby v. Archon*, 216 F.3d 549, 556 (6th Cir. 2000). USERRA provides, among other things, that "[a] person who is a member of . . . a uniformed service shall not be denied . . . retention in employment, . . . or any benefit of employment by an employer on the basis of that membership, . . . performance of service, . . . or obligation." 38 U.S.C. § 4311(c)(1).

An adverse employment action is prohibited under USERRA if the person's obligation for military service "is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such . . . obligation for service." *Id.* "Protected status is a motivating factor if a truthful employer would list it, if asked, as one of the reasons for its decision." *Escher v. BWXT Y-12*,

No. 09-6348          *Bobo v. United Parcel Service, Inc.*                    Page 18

*LLC*, 627 F.3d 1020, 1026 (6th Cir. 2010). Discriminatory motivation may be inferred from a variety of considerations, including proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the employer's conduct and the proffered reason for its actions, the employer's expressed hostility toward military members together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses. *Id.* If Bobo carries the initial burden to show by a preponderance that his protected status was a motivating factor in his discharge from employment, the burden shifts to UPS to prove affirmatively that it would have taken the same employment action in the absence of Bobo's protected status. *See Hance*, 571 F.3d at 518 (quoting *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001)); *Escher*, 627 F.3d at 1026; *Petty v. Metro. Gov't of Nashville-Davidson Cnty.*, 538 F.3d 431, 446 (6th Cir. 2008).

Taking all of the evidence in a light most favorable to Bobo, we conclude that there are genuine issues of material fact for trial concerning whether Bobo's military service was a motivating factor in his discharge and whether UPS would have taken the same employment action in the absence of Bobo's protected status. The district court ruled that Morton's comment, "I did not want Walleon volunteering for additional military duty when he was needed at UPS[,]" might have satisfied Bobo's *prima facie* case under USERRA if the statement had been made by someone responsible for the decision to fire Bobo. But, the court reasoned, Bobo did not present admissible evidence to tie Morton to the termination decision, nor did he establish that Morton poisoned the minds of the ultimate decision-makers against Bobo.

To the contrary, Bobo's evidence tied Morton and Morton's direct supervisor, Wagner, directly to the termination decision. A jury could reasonably find that Morton's comment is direct evidence that Bobo's military service was a motivating factor in employment decisions. Wagner was aware of Morton's discriminatory remark because he read, signed, and dated the memorandum in which the comment was made. The evidence also shows Bobo complained to Wagner about supervisor Langford's comment

that Bobo needed to choose between UPS and the Army, and that Bobo, Morton, and Wagner engaged in ongoing conversations about Bobo's requests to take leave to attend military training. Bobo felt discouraged from taking such leave, especially when Morton asked him if his military service was voluntary or involuntary. Wagner was present at the meeting when managers of the Mid-South District decided to terminate Bobo's employment.

Bobo also produced evidence that might permit a jury to find UPS liable for a USERRA violation through the "cat's paw" theory. This phrase refers to a situation in which "a biased subordinate, who lacks decision-making power, influences the unbiased decision-maker to make an adverse [employment] decision, thereby hiding the subordinate's discriminatory intent." *Cobbins v. Tennessee Dep't of Transp.*, 566 F.3d 582, 586 n.5 (6th Cir. 2009). If a direct supervisor performs an act motivated by anti-military animus that is intended to cause an adverse employment action and that act is a proximate cause of the adverse employment action, then the employer may be held liable under USERRA based on the "cat's paw" theory. *See Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011).

Bob Cowan was Wagner's supervisor and the second-in-command of the Mid-South District. In agreeing to terminate Bobo's employment, Cowan relied in part on information he received from Wagner. But it appears that Cowan did not know at the time of Bobo's termination that Wagner and Morton harbored anti-military animus against Bobo. During his deposition, Cowan learned of Morton's remark that was sent to and read by Wagner. Cowan characterized Morton's remark as "absolutely inappropriate" and a violation of UPS policy. This evidence suggests that Wagner influenced Cowan to agree to Bobo's firing, thereby hiding his own and Morton's discriminatory animus against Bobo. *See Staub*, 131 S. Ct. at 1194. Further, Cowan candidly acknowledged that, if he had known more facts, he might have recommended other discipline for Bobo, and not termination. His acknowledgment draws into question whether UPS can prove the defense that it would have discharged Bobo anyway for a valid reason.

The district court did not discuss Wagner's involvement in the termination decision or the potential liability of UPS under the "cat's paw" theory. Instead, the court focused narrowly on Morton and his lack of decision-making authority. The court also did not mention the other evidence Bobo produced indicating anti-military animus against him, including Langford's comment that he needed to choose between UPS and the Army, and the co-worker's warning to Bobo about the anti-military culture at UPS. Assuming that the district court on remand allows completion of the Kelley deposition, Bobo may also be able to show that Wagner identified Bobo's frequent military service as the reason why Oakhaven failed to complete safety rides on a timely basis. A reasonable jury hearing all of the facts could thus determine that Bobo proved a USERRA discrimination claim.

With regard to the USERRA retaliation claim, the district court held that the period between Bobo's submission of his military orders to Morton in March 2007 and his termination on May 22, 2007, did not establish temporal proximity. But looking at the facts in the light most favorable to the plaintiff, Bobo's discharge occurred just two weeks before his scheduled 2007 military service and less than two months after he submitted his military orders. We think Bobo demonstrated sufficient temporal proximity to establish a *prima facie* case of retaliation under USERRA. Therefore, we reverse the grant of summary judgment in favor of UPS on Bobo's USERRA claims.

### D. Title VII and § 1981 claims for race discrimination and retaliation

We review Title VII and § 1981 claims under the same standard. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009). The district court analyzed the race discrimination and retaliation claims as single-motive claims based on circumstantial evidence. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973); *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256-59 (1981). The court held that Bobo satisfied the first three elements of his prima facie case of race discrimination, but as to the fourth element he failed to identify a similarly-situated Caucasian employee who was treated more favorably than he was.

The court specifically ruled that Bobo and Spears were not similarly situated because they worked in different offices, held different jobs, and answered to different supervisors. We have already explained that we believe the district court applied *Mitchell* too narrowly, and in addition, evidence indicates that employment decisions for Bobo and Spears were made by the same high-level managers in the Mid-South District. The district court held that Bobo and Shumway were not similarly situated because Shumway's unsubstantiated infraction was different from the accusation against Bobo. But UPS's integrity policy covered various types of dishonesty and Bobo was not required to establish exact correlation with similarly situated employees, as we have already discussed. The district court further determined that Bobo did not make out a *prima facie* case of retaliation because, even assuming Bobo engaged in protected activity when he refused to disqualify Sharon Thompson, Bobo did not produce evidence to indicate that any alleged discrimination against Thompson occurred because of her race and/or gender.

Bobo argues that the district court erred in disposing of his race discrimination claim for failure to identify a similarly-situated Caucasian comparator, and we agree for reasons already stated. But more importantly, Bobo asserts the court should have analyzed the claim under a mixed-motive analysis, citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

In *Wright v. Murray Guard, Inc.*, 455 F.3d at 711-13, we explained the development of the law after *Price Waterhouse*, noting that Congress in 1991 added to Title VII a new statutory provision codifying the mixed-motive alternative for proving an unlawful employment practice. *Id.* at 711 (citing 42 U.S.C. § 2000e-2(m)). Under that statute, Bobo can proceed on a mixed-motive claim by demonstrating that race was a motivating factor in his termination, even though other factors also motivated his discharge. *See id.* If Bobo can make that showing, UPS is liable, although Bobo's remedies are limited if UPS can establish that it would have taken the same action in the absence of the impermissible motivating factor. *Id.* at 711-12 (citing 42 U.S.C. § 2000e-5(g)(2)(B)). Bobo can pursue a mixed-motive claim based solely on circumstantial

evidence. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100-01 (2003). At the summary judgment stage, the ultimate question is whether Bobo presented evidence, direct or circumstantial, from which a reasonable jury could logically infer that his race was a motivating factor in UPS's decision to terminate his employment. *See Wright*, 455 F.3d at 713.

Reviewing all of the evidence favorably to Bobo, a reasonable jury could logically infer that Bobo's race was a motivating factor in the discharge decision. None of the Caucasian supervisors who violated or were accused of violating the integrity policy suffered employment termination, except Ronnie Wallace. UPS insists that only Wallace and Bobo are similarly situated because they admitted misconduct. But whether the other identified supervisors who did not admit misconduct are similarly situated to Bobo is a jury question. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) (on summary judgment, court must not make credibility determinations or weigh evidence); *Hamilton v. General Elec. Co.*, 556 F.3d 428, (6th Cir. 2009) (*Reeves* reinforces fact that *Mitchell* cannot apply where non-moving party contests material facts). Therefore, we reverse the district court's grant of summary judgment to UPS on Bobo's Title VII and § 1981 discrimination claims.

We affirm, however, on the Title VII and § 1981 retaliation claims. Even if Bobo's refusal to disqualify Sharon Thompson constituted protected activity, Bobo did not establish the necessary causal connection between the protected activity and his discharge from employment. *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009).

### E. THRA claims

Finally, we reach the THRA claims. The district court ruled that Bobo's THRA claims failed for the same reasons his Title VII and § 1981 claims failed, noting that Tennessee courts look to federal cases applying federal anti-discrimination statutes as the baseline for interpreting and applying the THRA. *See e.g. Marpaka v. Hefner*, 289 S.W.3d 308, 313 (Tenn. Ct. App. 2008). During the pendency of this appeal, the question arose whether federal courts, on summary judgment, should continue to analyze

THRA claims similarly to Title VII claims in light of the Tennessee Supreme Court's decision in *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 779, 785 (Tenn. 2010) (holding in a common law retaliatory discharge case "that the *McDonnell Douglas* framework is inapplicable at the summary judgment stage because it is incompatible with Tennessee summary judgment jurisprudence" after *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 8-9 (Tenn. 2008)). Because *Gossett* was decided after the entry of summary judgment in this case, we accepted supplemental briefs from the parties and an *amicus curiae* brief from the Tennessee Employment Lawyers Association (TENNELA) concerning *Gossett's* effect. Shortly after oral argument, an amendment to Tenn. Code Ann. § 4-21-311(e) took effect, which appears to abrogate *Gossett* and *Hannan* and require the continued application of the *McDonnell Douglas* framework in THRA cases in accordance with the law prior to *Gossett* and *Hannan*.

We find it unnecessary to engage in a lengthy discussion of these developments. For the same reason we reverse summary judgment on Bobo's Title VII and § 1981 race discrimination claims, we also reverse summary judgment on the race discrimination claim under the THRA. Likewise, for the same reason we affirm summary judgment on Bobo's Title VII and § 1981 retaliation claims, we also affirm summary judgment on the retaliation claim under the THRA. We leave for the district court to decide in the first instance how the recent changes in Tennessee law affect Bobo's THRA discrimination claim.

Finally, because we reverse in part the grant of summary judgment for UPS, we do not reach Bobo's argument concerning the award of costs. We leave this issue to the district court for resolution on remand.

### IV. CONCLUSION

For all of the reasons stated, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** the case to the district court for further proceedings consistent with this opinion.