# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| JESSE ORTIZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-3123-STA-tmp |
| | ) | |
| HERSHEY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant Hershey Company's Motion for Summary Judgment (D.E. # 50) filed on June 20, 2013.  On July 29, 2013, Plaintiff Jesse Ortiz filed a corrected response in opposition with attachments (D.E. # 61–66), and Defendant has filed its reply brief (D.E. # 76).  For the reasons set forth below, Defendant's Motion is **GRANTED**.

## BACKGROUND

The Amended Complaint alleges that Plaintiff Jesse Ortiz is a Mexican-American who was formerly employed with Defendant Hershey Company.  Plaintiff alleges that in the course of his employment, he suffered race and gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964.  Defendant now seeks judgment as a matter of law on Plaintiff's claims.  Pursuant to Local Rule 56.1(a), Defendant has prepared a statement of facts "to assist the Court in ascertaining whether there are any material facts in dispute."[1]  For purposes of summary

---

[1] Local R. 56.1(a).

1

judgment, a party asserting that a material fact is not genuinely in dispute must cite to particular parts of the materials in the record and show that the materials fail to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact.[2]

As the non-moving party, Plaintiff must respond to Defendant's statement of facts "by either (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed."[3] Additionally, Plaintiff may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."[4]  Where Plaintiff asserts that a genuine dispute of material fact exists, Plaintiff must support his contention with a "specific citation to the record."[5]  If Plaintiff fails to demonstrate that a fact is disputed or simply fails to address Defendant's statement of fact properly, the Court will "consider the fact undisputed for purposes" of ruling on the Motion.[6]

## I. Factual Background

---

[2] Fed. R. Civ. P. 56(c)(1).

[3] Local R. 56.1(b).

[4] Fed. R. Civ. P. 56(c)(2).

[5] Local R. 56.1(b).

[6] Fed. R. Civ. P. 56(e)(2); *see also* Local R. 56.1(d) ("Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these rules shall indicate that the asserted facts are not disputed for purposes of summary judgment.").

The Court finds that there is no genuine dispute as to the following material facts, unless otherwise noted. Hershey maintains a manufacturing plant in Memphis, Tennessee (the "Plant" or the "Memphis Plant"), where mints and other confectionary products are produced, and at which Plaintiff began work on October 28, 2001. (Def.'s Statement of Undisputed Fact ¶ 1.) Plaintiff's job title throughout his employment was Press Operator ("operator"), in the Plant Mints Department ("Mints"). (*Id.* ¶ 2.) When Ortiz commenced employment at the Memphis Plant, he and the other *BreathSavers* Mints operators rotated among the four *BreathSavers* production lines (A, B, C, D). (*Id.* ¶ 3.)

In or around 2002 or 2003, Mike Bernot, the former Mints supervisor, stopped the rotation practice and assigned each operator to a specific production line. (*Id.* ¶ 4.) Bernot assigned Plaintiff to be the D-Line operator on first shift, where he remained for the duration of his Hershey employment. (*Id.* ¶ 5.) Plaintiff does not claim that Bernot ever discriminated against him. (*Id.* ¶ 8.) According to Plaintiff, the rotation process was stopped for legitimate "business reasons," not for discriminatory or other unlawful reasons. (*Id.* ¶ 7.)[7] Plaintiff never bid for or sought to be assigned to any plant position other than first shift *BreathSavers* D-Line operator. (*Id.* ¶ 6.) Before 2005, Ortiz found his job to be "rewarding." (*Id.* ¶ 9.)

At some point, production on the C-Line ceased, leaving three (3) *BreathSavers* production lines (A, B, and D) in Mints for the remainder of Ortiz's tenure with Defendant. (*Id.* ¶ 10.) In 2009,

---

[7] Plaintiff disputes this statement, explaining that he "answered Yes and No to what he thought was in Bernot's mind" and asserting that he "is not capable of expressing the thought set forth by this fact." Although it is not clear to the Court what Plaintiff's response means, the Court finds that Plaintiff has not demonstrated that the fact is disputed. Plaintiff was asked in his deposition whether he believed Bernot made the decision to reorganize the shifts for business reasons and Plaintiff answered "Yes." Ortiz Dep. 121:7–11, Mar. 7, 2013. Therefore, Defendant's statement is undisputed for purposes of summary judgment.

there were four press machines on each line, and the D-line also had an "add-on" line, which fed a different type of mint (*Ice Breakers*) to the plant's packaging department along with the *BreathSavers* mints.   (*Id.* ¶ 12.)   After Defendant eliminated production on C-line, each *BreathSavers* line ran continuously with operators at all three lines on first, second, and third shifts, though not all four press machines on each line were run during every shift. (*Id.* ¶¶ 11, 13.) The number of press machines run during a shift depended on the product supply and demand at a given time. (*Id.* ¶ 13.)[8]

All Mints operators were responsible for "mak[ing] a quality tablet to deliver to the packaging area," which included "perform[ing] metal detector checks," "weight checks," "b[u]lking off for extra tablets," and "mov[ing] barrels." (*Id.* ¶ 14.) Plaintiff adds that he had many more responsibilities than other similarly situated operators. (Pl.'s Resp. to Statement of Undisputed Fact ¶ 14.) Operators' producing a "quality tablet" included "checking and documenting the product's weight, size, hardness and kind." (Def.'s Statement of Undisputed Fact ¶ 15.)

All Mints operators' responsibilities included performing hourly metal detector checks to ensure that metal did not contaminate the mints being produced on their respective lines. (*Id.* ¶ 16.)[9]

---

[8] Plaintiff disputes Defendant's statements about all of the lines running continuously and the fact that not all press machines on each line ran on every shift. Plaintiff has not actually explained why a dispute exists. Plaintiff merely cites excerpts from the deposition testimony of Angie Salas. Salas testified that like Plaintiff she and Wes Garlock were operators and that she and Garlock did not run all of the presses on their respective lines. Salas says nothing to suggest that the lines did not run continuously on all shifts or explain why not all of the presses would run on each line. Based on the evidence cited, Plaintiff has not shown that a material dispute exists on this point.

[9] Plaintiff disputes this statement and cites for support his own summary judgment affidavit. However, Plaintiff simply avers in his affidavit that he did perform hourly, metal detector checks on his line. Ortiz Aff. ¶ 7. It is not clear to the Court why Plaintiff disputes this statement.

4

Metal detector checks require an operator to send three metal wands down his or her production line, one at a time. (*Id.* ¶ 17.)  When the metal detectors were functioning properly, they would alight as the wands passed through them to indicate the presence of metal content.  (*Id.* ¶ 18.)  Once the wands reached the end of the line, it was expected that they would kick off, or eject from, the conveyor belt and land in the line's ejector bucket.  (*Id.* ¶ 19.)  Each operator had the responsibility to ensure that a wand did in fact kick off the line and land in the ejector bucket, or, if a wand did not, to locate and retrieve the wand before it traveled up the elevator, through the hopper, and into the packaging department.  (*Id.* ¶ 20.)[10] If an operator could not locate one of his or her metal wands following performance of a metal detector check, plant policy required that he or she report the lost wand to his or her supervisor.  (*Id.* ¶ 21.)

Phyllis Grandberry transferred to Mints in March 2007, at which time she became the first shift supervisor and Plaintiff's direct supervisor. (*Id.* ¶ 22.) Before Grandberry's transfer into Mints, plant policies had not been enforced in Mints as consistently as Defendant had desired or expected. (*Id.* ¶ 23.) When Grandberry transferred to Mints in 2007, she enforced plant policies more strictly and managed her supervisees more closely than prior Mints supervisors had done.  (*Id.* ¶ 24.)[11]

---

[10] Plaintiff disputes this statement with the following characterization of the evidence: "It was an operator's job to look for the wand and make sure it did not kick out. It is the operator's job to find it."  However, the Court fails to see how Plaintiff's statement demonstrates a material dispute with the statement drafted by Defendant.  Therefore, the Court finds this fact to be undisputed for purposes of summary judgment.

[11] Plaintiff disputes this statement, asserting that "Grandberry remained silent when Gary Johnson turned the presses off on 'D' line." However, the evidence cited by Plaintiff does not actually support the contention. Plaintiff also cites evidence that Grandberry did not intervene when two employees in the packaging department had a verbal altercation. Plaintiff has not shown, however, that the two employees worked under Grandberry's supervision. In sum, the evidence cited does not demonstrate that a genuine dispute exists about Grandberry's closer supervision practices. Therefore, the Court finds that this statement is undisputed.

5

Between March 2007 and August 2010, Grandberry issued 77 disciplinary write-ups to her Mints supervisees. (*Id.* ¶ 25.) Of the 77 write-ups issued by Grandberry, 13% were issued to Hispanic/Mexican-American employees, 81% were issued to African American employees, and 6% were issued to Caucasian employees, percentages that are consistent with the demographic make-up of the Mints employees under Grandberry's supervision. (*Id.* ¶ 26.)

On first shift, Grandberry supervised Plaintiff and operators Wes Garlock and Angie Salas. (*Id.* ¶ 27.) Garlock was first shift operator on the B-Line. (*Id.* ¶ 28.) According to Hershey's business records, Garlock has never committed a quality control ("QC") violation. (*Id.* ¶ 29.) Garlock has committed only one disciplinary infraction during his plant tenure and received a written warning for insubordination. (*Id.* ¶ 29.) Salas was first shift operator on the A-Line. (*Id.* ¶ 30.)

Gary Johnson was first shift back-up operator, which according to Defendant entailed responsibilities different from the normal operators like Plaintiff, Garlock, and Salas. (*Id.* ¶ 31.)[12] Johnson was responsible for "clean[ing] the presses, and then if somebody was gone, he would fill in that position." (*Id.* ¶ 32.) Plaintiff adds that back-up press operator was Johnson's "regular employment status" and that Johnson performed all of the relevant duties of a press operator such as metal checks, cleaning machines, running presses, and making quality tablets. (Pl.'s Resp. to Statement of Undisputed Fact ¶ 32.) During his tenure as back-up operator, Johnson filled-in for Plaintiff, Garlock, and Salas, among others. (Def.'s Statement of Undisputed Fact ¶ 33.) When Johnson filled in for Garlock, Salas or Plaintiff, he was responsible for all their regular operator

---

[12] Plaintiff disputes this fact and states that "Johnson's job was similarly situated to Plaintiff's in all relevant respects." However, Plaintiff has cited no evidence to support his contention. Therefore, the Court finds that Defendant's statement is undisputed for purposes of summary judgment.

duties, including running "four or five presses," depending on the line and the supply and demand at the time.  (*Id.* ¶ 34.)  Plaintiff adds that Johnson would turn off some of the presses when he worked the "D" line.  (Pl.'s Resp. to Statement of Undisputed Fact ¶ 34.)

Of the first shift operators, Plaintiff was the "most knowledgeable" about the press machines. (Def.'s Statement of Undisputed Fact ¶ 37.)  When Plaintiff complained to Grandberry about his workload, Grandberry told him that she would get him help.  (*Id.* ¶ 38.)  Plaintiff adds that Grandberry also told him that if he could not do his job, she would find another person who could. (Pl.'s Resp. to Statement of Undisputed Fact ¶ 38.)  Plaintiff concedes that he was assigned help from Marilyn Clemmons in 2007 or 2008.  (Def.'s Statement of Undisputed Fact ¶ 39.)  Plaintiff asserts that when he did receive help, it would later be taken away.  (Pl.'s Resp. to Statement of Undisputed Fact ¶ 39.)  Clemmons, who is  African-American, was an *IceBreakers* press operator, and, according to Hershey business records, Clemmons incurred only one QC violation during her tenure, for which she received a written warning.  (Def.'s Statement of Undisputed Fact ¶ 40.)

Plaintiff received several disciplinary warnings during his tenure with Defendant.  On September 11, 2007, Plaintiff received and signed a written warning for failing to perform his hourly metal detector checks in violation of the Plant's QC policy.  (*Id.* ¶ 41.)  Under plant policy, in addition to the written warning, Plaintiff's September 11, 2007 QC violation called for a one-day unpaid suspension.  (*Id.* ¶ 42.)  Grandberry made the decision not to suspend Plaintiff for his September 11, 2007 QC violation.  (*Id.* ¶ 43.)  On January 24, 2009, Plaintiff received and signed a written warning for violating Plant work quality ("WQ") policy, where he mislabeled four drums of *BreathSavers* mints that were shipped to a customer.  (*Id.* ¶ 44.)   On May 27, 2009, Plaintiff received and signed a written warning for a QC violation for failing to empty the candy dispense pan

used to collect the metal detector from his production line.  (*Id.* ¶ 45.)  On March 22, 2010, Plaintiff received and signed a written warning for a QC violation for mis-identifying the flavor of mints for which he had run tablets during his shift.  (*Id.* ¶ 46.)  Plaintiff had written "spearmint" on his QC report, when, in fact, wintergreen tablets had been run.  (*Id.*)  Given that the March 22, 2010 warning was Plaintiff's fourth QC violation, plant policy stated that Plaintiff should receive a one-day suspension without pay.  (*Id.* ¶ 47.)  However, Grandberry decided not to suspend Plaintiff for the March 22, 2010 infraction.  (*Id.* ¶ 48.)

On January 29, 2008, Ortiz was suspended without pay in connection with an incident with a plant mechanic named Claude Taylor.  (*Id.* ¶ 49.)  Following an investigation by Wanda McKinnon, the Memphis Plant human resources ("HR") manager, McKinnon found the following facts.  (*Id.* ¶ 50.)  Taylor was trying to fix equipment in a tight area of the packaging department. (*Id.*)  Plaintiff did not work in this area but had gone there to visit his wife who did work there.  (*Id.*) Taylor tried to work around Plaintiff but accidentally elbowed Plaintiff while trying to perform the repair.  (*Id.*)  Plaintiff reacted by asking Taylor if he could say "excuse me" to which Taylor responded, "Well, excuse me." (*Id.*)  Plaintiff told Taylor that the next time, Plaintiff's "elbow might be in [Taylor's] face." (*Id.*)  Plaintiff responds to these conclusions by asserting that McKinnon never asked for his side of the story.  (Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶ 50.) Plaintiff further denies that Taylor was actually working in the area, that Plaintiff was in the area to visit his wife, or that Taylor's act of elbowing Plaintiff was accidental.  (*Id.*)

Taylor reported to his supervisor, Ken O'Brien, that Taylor deemed Plaintiff's response to him to be a threat, which O'Brien in turn reported to McKinnon. (Def.'s Statement of Undisputed Fact ¶ 53.)  McKinnon claims to have spoken with both Taylor and Plaintiff during her investigation,

though Plaintiff denies that McKinnon ever spoke to him.  (*Id.* ¶ 54; Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶ 54.)  Plaintiff admits that he told Taylor the next time, his "elbow might be in [Taylor's] face." (Def.'s Statement of Undisputed Fact ¶ 56.)  Hershey has a zero-tolerance policy for workplace violence, such that if an employee is found to have engaged in any sort of workplace violence, the result is "automatic termination" of his or her employment.  (*Id.* ¶ 58.)  Plaintiff adds that even though Taylor struck him, Taylor was not disciplined.  (Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶ 58.)  Based on Plaintiff's admission that he had told Taylor he might elbow him in the face and Taylor's belief that Plaintiff was threatening him, McKinnon suspended Plaintiff on January 29, 2008, until she could speak with Grandberry, the plant manger Ray Jennings, the first shift manager Jerry Love, and the manufacturing manager Mike Clements about the situation. (Def.'s Statement of Undisputed Fact ¶ 59.)  Plaintiff adds that he received a two-week suspension without pay.  (Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶ 59.)

Management determined that although Plaintiff threatened Taylor, Plaintiff's termination was not required under Defendant's zero-tolerance policy.  (Def.'s Statement of Undisputed Fact ¶ 60.) On January 31, 2008, Hershey gave Plaintiff a last chance agreement ("LCA") because of the incident with Taylor.  (*Id.* ¶ 61.)  An LCA is a disciplinary tool Hershey uses to provide employees who otherwise are eligible for termination with "one more opportunity . . . to correct their behavior" and "continue their employment."  (*Id.* ¶ 62.)[13]  Plaintiff's LCA stated that if he was "found in violation of any company policy, including employee to employee relationships, threatening behavior

---

[13] Plaintiff disputes the fact by stating that McKinnon herself had never issued an LCA to an employee before she decided to issue the LCA to Plaintiff in January 2008.  Defendant cites evidence that McKinnon has issued 36 LCAs during her tenure in Memphis.  The Court finds that this evidence is not material to the issues presented at summary judgment.

or any type of workplace violence, attendance, GMP violations, work standards, quality, safety" or other policy listed in the employee handbook, his employment would be subject to "immediate[] termination." (*Id.* ¶ 64.) Plaintiff signed the LCA on January 31, 2008. (*Id.* ¶ 65.) Based on his LCA, Plaintiff understood that if he committed any further policy violations or infractions, his employment could be terminated immediately. (*Id.* ¶ 66.) In other words, Plaintiff faced immediate termination each time he received discipline thereafter. (*Id.* ¶ 67.)[14]

On August 18, 2010, while Ortiz was working his normal, D-Line, first shift position, it was discovered that a production line metal wand had traveled into packaging, where it had become lodged in one of the packaging machine carousels. (*Id.* ¶ 68.) Once the wand was recovered from the packaging machine, a plant production support employee, Ramona McDonald questioned Plaintiff about his wand. (*Id.* ¶ 69.) Plaintiff responded that he had been unable to find one of his wands following his performance of a metal detector check, as the wand had not "kicked-off" the conveyor "as it should have." (*Id.* ¶ 70.) McDonald then handed Plaintiff the wand that had been lodged in a packaging machine carousel and told him that it had become lodged, to which Plaintiff responded, "Oh man, it went in the machine." (*Id.* ¶ 71.) McDonald reported what had happened to Grandberry and McKinnon. (*Id.* ¶ 72.) Grandberry immediately spoke with Plaintiff about it. (*Id.*) Plaintiff admitted to Grandberry that he had lost one of his wands and, that same day, Ortiz admitted to Johnson that he had forgotten about the wand. (*Id.* ¶ 73.) Plaintiff adds that due to his

_____

[14] Plaintiff adds that Defendant discriminated against him by holding him to a higher standard.

workload, he had to choose which situation to address first, the missing wand or fixing the "bad candy." (Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶ 73.)[15]

As a result of Ortiz losing his wand and the wand becoming lodged in a packaging machine, Defendant had to shut down the D-Line, all of the candy from the line had to be "drain[ed];" and Grandberry had to make sure Ortiz's wand had not damaged any equipment. (Def.'s Statement of Undisputed Fact ¶ 74.)[16]  Plaintiff adds that no damage was done to the machine and that the production "made standard," though Plaintiff does not explain what this means. (Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶ 74.)  When a operator lost a metal detector wand, plant procedure required that the operator locate the wand immediately and, if he or she is unable to do so, notify his or her supervisor immediately. (Def.'s Statement of Undisputed Fact ¶ 75.)  Plaintiff responds that he was performing a two-person job and that he never received training on the proper procedure to report a missing wand when performing a two-person job. (Pl.'s Resp. to Statement of Undisputed Fact ¶ 75.)  Plaintiff did not locate his lost wand or inform his supervisor about the

---

[15] Plaintiff's testimony on this point is not entirely clear.  Viewing the evidence in the light most favorable to Plaintiff, Plaintiff seems to have testified that at the time his wand went missing, "Angie yelled at" him to take care of a press running soft candy.  Ortiz Dep. 40:5-12.  Plaintiff explained that he had to choose between following the instruction from Angie and looking for his wand.  *Id.* at 12-16.  Plaintiff never actually testified that candy was "bad."

Plaintiff also asserts that a new machine, presumably a metal detector, was installed the weekend before this incident and that a technician came to adjust the machine. (Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶ 73.)  Plaintiff cites his own deposition testimony to support his contention.  However, Plaintiff has not made the deposition transcript part of the record.  Therefore, the Court declines to consider this fact for purposes of summary judgment.

[16] Contrary to Defendant's assertion, Grandberry never testified that D-line had to be shut down for two to threes hours when Plaintiff lost his wand, only that it could take up to two or three hours when such a shutdown did occur.

issue. (Def.'s Statement of Undisputed Fact ¶ 76.)[17]  According to Grandberry, no other operator

under her supervision had ever lost a wand that traveled to packaging without notifying her about

it. (*Id.* ¶ 77.)[18]  Plaintiff has offered another operator Gary Johnson as a non-protected comparator

employee.  When Johnson was asked under oath about whether he ever had lost a metal detector

wand, Johnson testified that on one occasion, one of his wands did not eject into his bucket but he

located it within "two to three minutes" and stopped it from traveling through the hopper or causing

any disruption to production. (*Id.* ¶ 79.)  Johnson's loss of a wand did not violate plant policy. (*Id.*

¶ 80.)[19]

On August 20, 2010, two days after Plaintiff's metal contamination violation, Plaintiff

committed another violation of plant QC policy.  At that time McDonald witnessed Ortiz standing

---

[17] Plaintiff disputes this fact by stating that Ramona McDonald took him to Grandberry's office after the incident. (Pl.'s Resp. to Statement of Undisputed Fact ¶ 75.)  However, this fact does not create a genuine dispute about whether Plaintiff reported the missing wand to Grandberry beforehand.  Therefore, it is irrelevant to the Court's analysis.

[18] Plaintiff disputes this fact, asserting that wands are commonly lost and that Gary Johnson had told Grandberry he lost his wands all of the time. (Pl.'s Resp. to Statement of Undisputed Fact ¶ 77.)  Plaintiff further asserts that Johnson had lost a wand earlier in the same week and that another employee Marilyn Clemons had twice lost wands but never received a write-up. (*Id.* ¶ 78.)  Even accepting these contentions as true, the evidence Plaintiff cites only shows that operators periodically lost wands.  The evidence does not show, however, that operators lost wands and then failed to report the problem to a supervisor, as policy required.

[19] Plaintiff disputes this statement and asserts that Johnson failed to follow the proper procedure because Johnson should have reported it and then found the missing wand. (Pl.'s Resp. to Statement of Undisputed Fact ¶ 80.)  However, the undisputed evidence shows that the proper procedure was to attempt to locate the wand immediately and then if the wand was not found, to report the incident to a supervisor immediately.  Def.'s Statement of Undisputed Fact ¶ 75.  Curiously, Plaintiff supports his contention that Johnson failed to follow the proper policy by citing Grandberry's testimony that Johnson had actually followed the correct policy.  It is not clear to the Court how such evidence demonstrates a genuine dispute about whether Johnson followed the correct procedure when his wands went missing.

beside the D-Line conveyor belt picking up white plastic pieces as they traveled down the belt.  (*Id.* ¶ 81.)  McDonald approached Plaintiff, and Plaintiff was called to speak to Grandberry.  (*Id.* ¶ 82.) According to Grandberry, equipment on the production lines can malfunction, causing plastic bits to get mixed-in with and contaminate the candy.   (*Id.* ¶ 84.)  When this occurs, operators are responsible to immediately notify their supervisor and to stop the line.  (*Id.*)  Defendant contends that Plaintiff failed to report the plastic on his line to Grandberry (or to any other manager) and failed to stop his line.  (*Id.* ¶ 85.)  Plaintiff responds that when he was summoned to Grandberry's office, QC was already aware of the plastic.  (Pl.'s Resp. to Statement of Undisputed Fact ¶ 85.)

Given the severity of Plaintiff's metal contamination and plastic contamination incidents, coupled with Plaintiff's history of QC violations and his LCA status, Defendant determined that further investigation was warranted before it reached a decision about Plaintiff's continued employment.  (Def.'s Statement of Undisputed Fact ¶ 86.)  Plaintiff was suspended without pay during the investigation.  (*Id.* ¶ 87.)  McKinnon from HR investigated both the August 18 and 20 incidents in accordance with plant practice.  (*Id.* ¶ 88.)

Based on her investigation, McKinnon made the following findings concerning the August 18, 2010, metal contamination incident: (1) during a routine, hourly QC metal detector check, Plaintiff had placed his metal wands onto the production conveyor belt but then failed to follow plant protocol by not accompanying the wands along the production line until they passed through the metal detector and ejected-off the conveyor belt; (2) one of his wands did not eject-off the belt but traveled with candy along the production line all the way to packaging where the wand was discovered by another employee when she heard a loud clang in one of the packaging machines; (3) the packaging machines had to be taken offline, maintenance was called, and Plaintiff's wand was

found lodged in one of the machine carousels; and (4) as a result, production on the line had to be shut down for several hours. (*Id.* ¶ 89.) Plaintiff disputes that his wand ever reached production or that the packaging line was ever shut down. (Pl.'s Resp. to Statement of Undisputed Fact ¶ 89.)

Likewise, McKinnon made the following findings during her investigation of the August 20, 2010 plastic contamination incident: (1) McDonald found Plaintiff and Dave Hawkins standing next to the D-line, picking plastic pieces off the conveyor belt; (2) McDonald instructed Plaintiff to go see Grandberry; (3) McDonald called QC to report the incident; and (4) another operator had to "bulk-off" the remainder of the candy on the D-line conveyor belt. (Def.'s Statement of Undisputed Fact ¶ 90.) Plaintiff asserts that he instructed co-workers to "bulk-off" the candy and that QC was not called but was already present in the area. (Pl.'s Resp. to Statement of Undisputed Fact ¶ 90.)

At the conclusion of her fact investigation into Plaintiff's two August 2010 incidents, McKinnon met with Jennings to review Plaintiff's employment file. (Def.'s Statement of Undisputed Fact ¶ 91.) McKinnon and Jennings reached the following conclusions: (1) Plaintiff had accumulated six quality control violations since September 2007, including two violations for failure to follow protocol during hourly metal detector checks; (2) Plaintiff had been trained on the quality control checks and was aware of his job responsibilities; (3) Plaintiff was on an LCA at the time of his August 2010 violations; and (4) Plaintiff had been warned and was on notice that any post-LCA violations of plant policy would result in discipline, up to and including termination. (*Id.* ¶ 92.) Based on these conclusions, McKinnon and Jennings determined that Plaintiff's record of plant policy violations amounted to a continuous disregard for plant policy that warranted the termination

of his employment.  (*Id.* ¶ 93.)[20]  Defendant terminated Plaintiff's employment effective August 30, 2010.  (*Id.* ¶ 94.)

Plaintiff testified that McKinnon and Grandberry are the only two individuals who "discriminated against [him] based on [his] being Mexican."  (*Id.* ¶ 103.)  However, Plaintiff never heard McKinnon or Grandberry use a racial epithet or make a racially derogatory remark.  (*Id.* ¶ 112.)  As for other evidence related to his race discrimination claim, Plaintiff was having lunch in 2008 with a mechanic in Defendant's gum department named John Cruise.  (*Id.* ¶ 109.)  According to Plaintiff, "some news came on about wetbacks, Mexicans" and the "immigration controversy" to which Cruise told Plaintiff that the government should just get them all [Mexicans]" and "fill all the buses . . . and then send them back to Mexico where they belong."  (*Id.*)  Plaintiff informed a supervisor whom he only knew as Ginger about Cruise's comment, and Ginger claimed she reported the incident to McKinnon.  (*Id.* ¶ 111.)  Plaintiff does not believe that McKinnon ever took any corrective action.  (*Id.*)[21]

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant

---

[20] Plaintiff disputes this fact by citing his summary judgment affidavit in which he stated that he was suspended "right away" and that McKinnon did not investigate the situation.  Ortiz Aff. ¶ 22.  The Court finds that Plaintiff's statement does not actually contest Defendant's assertion that the decision to terminate Plaintiff's employment was based on his record of policy violations.

[21] Plaintiff also testified to another comment he once heard from another co-worker who said that Defendant "liked Mexican[s] because they work harder, do their job better."  (Def.'s Statement of Undisputed Fact ¶ 108.)  Plaintiff has not shown why this hearsay statement would be admissible at summary judgment.  Therefore, the Court declines to consider it.

is entitled to judgment as a matter of law.[22]   The Supreme Court has stated that "[t]hough determining whether there is a genuine issue of material fact at summary judgment is a question of law, it is a legal question that sits near the law-fact divide."[23]   In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party,[24] and the "judge may not make credibility determinations or weigh the evidence."[25] When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[26]   It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[27]   These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[28]   In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [her] asserted causes of action."[29]

---

[22] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

[23] *Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009).

[24] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[25] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

[26] *Celotex*, 477 U.S. at 324.

[27] *Matsushita*, 475 U.S. at 586.

[28] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[29] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[30]  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[31]

## ANALYSIS

### I. Plaintiff's Unsupported Claims

As a threshold matter, the Court notes that Plaintiff has failed to respond to Defendant's arguments as to several of Plaintiff's claims including his claim for gender discrimination and retaliation under Title VII.  Defendant's opening memorandum briefs the relevant legal standard for these claims under Title VII and seeks judgment as a matter of law as to the claims.  District courts in this Circuit routinely grant summary judgment as to claims a plaintiff fails to support or address in a response to a motion for summary judgment.[32]  In his response in opposition to Defendant's Motion for Summary Judgment, Plaintiff refers specifically only to Title VII and his theory of race

---

[30] *Anderson*, 477 U.S. at 251–52.

[31] *Celotex*, 477 U.S. at 322.

[32] *Burress v. City of Franklin, Tenn.*, 809 F. Supp. 2d 795, 809 (M.D. Tenn. 2011); *Anglers of the Au Sable v. U.S. Forest Serv.,* 565 F. Supp. 2d 812, 839 (E.D. Mich.2008)*; Dage v. Time Warner Cable*, 395 F. Supp. 2d 668, 679 (S.D. Ohio 2005); *Kattar v. Three Rivers Area Hosp. Auth.*, 52 F. Supp. 2d 789, 798 n.7 (W.D. Mich. 1999).  *See also Clark v. City of Dublin,* No. 05-3186, 2006 WL 1133577, at *3 (6th Cir. Apr. 27, 2006) (where the appellant did not properly respond to the arguments asserted against his ADEA and ADA claims by the appellees in their motion for summary judgment, the appellant had abandoned his ADEA and ADA claims); *Conner v. Hardee's Food Sys.,* No. 01-5679, 2003 WL 932432, at *4 (6th Cir. Mar. 6, 2003) (finding that, "Because Plaintiffs failed to brief the issue before the district court . . . Plaintiffs abandoned their . . . claim."); *Hazelwood v. Tenn. Dept. of Safety*, No. 3:05-cv-356, 2008 WL 3200720, at *8 (E.D. Tenn. Aug. 5, 2008).

17

discrimination.  The brief is entirely silent as to Plaintiff's gender and retaliation claims.  Plaintiff

fails to cite legal authority or brief any of the relevant record evidence to show why genuine factual

disputes remain as to these claims.  As a result, the Court finds that Plaintiff has abandoned these

unsupported claims.  Therefore, Defendant's Motion for Summary Judgment is **GRANTED** as to

Plaintiff's claims for gender discrimination and retaliation.

## II. Race Discrimination

Title VII states that it is an "unlawful employment practice for an employer . . . to

discriminate against any individual . . . because of [his] race, color, religion, sex, or national

origin."[33]   "[A] plaintiff must either present direct evidence of discrimination or introduce

circumstantial evidence that would allow an inference of discriminatory treatment."[34] "Direct

evidence proves the existence of a fact without requiring any inferences."[35] "[D]irect evidence is that

evidence which, if believed, requires the conclusion that unlawful discrimination was at least a

motivating factor in the employer's actions."[36]  Plaintiff's memorandum briefs the familiar burden-

shifting framework applied in cases based on circumstantial evidence.[37]  The Court finds no direct

---

[33] 42 U.S.C. § 2000e–2(a)(1).

[34] *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003).

[35] *Hale v. ABF Freight Sys., Inc.*, 503 F. App'x 323, 330 (6th Cir. 2012) (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)) (ellipsis omitted).

[36] *Id.*; *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).

[37] In his response to Defendant's statement of undisputed facts, Plaintiff asserts without elaboration that his suspension in January 2008 and his last-chance agreement constitute direct evidence of discrimination.  *See* Pl.'s Resp. to Statement of Fact ¶ 120.  Plaintiff cites for support his own deposition testimony but without making the pages cited part of the record.  Without this evidence, the Court declines to consider the issue further.

evidence of discrimination in this case.[38]   Therefore, Plaintiff's claim is based strictly on circumstantial evidence.

Where as here a plaintiff offers only circumstantial evidence of unlawful discrimination, the Court analyzes the case using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).[39]  Plaintiff bears the initial burden to establish his prima facie case of discrimination by showing that (1) he is a member of a protected group, (2) he was subject to an adverse employment decision, (3) he was qualified for the position, and (4) he was treated differently than similarly situated non-protected employees.[40]  "Under the *McDonnell Douglas* burden-shifting framework, once a plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual."[41]

Defendant seeks summary judgment on Plaintiff's race discrimination claim, arguing that Plaintiff cannot establish that he was treated differently than similarly situated non-protected

---

[38] Plaintiff has not argued that the stereotypical or derogatory comments of his co-workers constitute direct evidence of discrimination.  Indeed, stray remarks or ambiguous acts of third parties who have no part in the decision-making process generally do not constitute direct evidence of discrimination.  *Carter v. Univ. of Toledo,* 349 F.3d 269, 273 (6th Cir. 2003) ("[C]omments made by individuals who are not involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination.").

[39] *Dodd v. Donahoe*, 715 F.3d 151, 156 (6th Cir. 2013) (citation omitted).

[40] *Id.* Plaintiff can also make his prima face showing with proof that he was replaced by a person outside of the protected class.  *Russell v. Univ. of Toledo,* 537 F.3d 596, 604 (6th Cir. 2008).  However, Plaintiff has not raised this issue or cited any proof to make the showing at summary judgment.

[41] *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).

employees when Defendant terminated him.  According to Defendant, Plaintiff has failed to prove that similarly situated operators committed comparable QC violations and yet received more favorable treatment than Plaintiff.  Plaintiff answers that Defendant discriminated against him by assigning him more duties than other operators and then disciplining Plaintiff for failing to perform all of the duties.  Defendant rejoins that Plaintiff's subjective beliefs about his additional responsibilities are not relevant.  Furthermore, Plaintiff conceded in his deposition that a different manager assigned him to the D-line for business reasons, and not because of discrimination. Therefore, Defendant maintains that judgment as a matter of law is appropriate on the claim.

The Court holds that Plaintiff has failed to establish his prima facie case of race discrimination.  As a threshold matter, the Court notes that the Amended Complaint actually alleges three discrete acts of discrimination in this case: the inequitable assignment of job duties, the issuance of the last-chance agreement in January 2008, and Plaintiff's termination in August 2010.[42] Under Title VII, termination, disparate discipline, and the alteration of job duties are discrete acts.[43] Defendant seeks summary judgment on each claim.  Therefore, the Court will consider the evidence supporting each theory separately.

---

[42] Am. Compl. ¶¶ 6–8 (alleging the inequitable assignment of work); 9–15 (alleging disparate treatment for the last-chance agreement); and 16–18 (alleging that Plaintiff was wrongfully terminated); *see also* Pl.'s EEOC Charge, ex. A, McKinnon Decl. (D.E. # 50-4), Page I.D. # 397 ("In August 2010, I was suspended and discharged by Phyllis Grandberry (b/f), Supervisor, and Wanda McKinney (w/f), HR Manager" for "failing to stop a line because a metal detector wand go caught in my machine . . . . Additionally, I was the only employee who was consistently assigned to operate four presses as well as operate two lines during my employment.").

[43] *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 993–94 (6th Cir. 2009) ("Under Title VII, a victim of discrimination can allege one of two types of actions: (1) discrete discriminatory acts, and (2) claims alleging a hostile work environment.") (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) (internal quotation marks omitted).

## A. Assignment of Job Responsibilities

First, Plaintiff alleges that Defendant discriminated against him by assigning him additional job responsibilities that other similarly situated operators were not required to perform, though it is not at all clear when Defendant increased Plaintiff's job duties.[44]   Defendant argues that the assignment of job responsibilities does not rise to the level of an adverse employment action. Plaintiff does not address this argument in his memorandum and actually states that the adverse action forming the basis of his discrimination claim was his termination.   Plaintiff has arguably abandoned an independent cause of action based on the inequitable assignment of job duties.   The Court holds that Defendant would be entitled to summary judgment on such a claim for this reason alone.

Even if Plaintiff had not abandoned his claim, the Court holds that Defendant is entitled to judgment as a matter of law.   For purposes of Title VII, an adverse employment action is "a materially adverse change in the terms and conditions of [a plaintiff's] employment."[45]   For example, an adverse employment action usually results in a "significant change in employment status," such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

_____

[44] Defendant's Statement of Facts assert that the Memphis Plant shut down one of the four production lines "at some point" and that in 2009, each line had four press machines and D-Line had the *Ice Breakers* "add-on" line.   Statement of Undisputed Fact ¶¶ 10, 12.   Plaintiff has not disputed these assertions.   Even so, it is not clear when Plaintiff saw an increase in his responsibilities.   The issue is relevant to Plaintiff's theory that Defendant increased his duties and then terminated him essentially for not being able to keep up, all because of his race.   Although standing alone an increase in Plaintiff's job responsibilities is not a materially adverse employment action, it does provide context for Plaintiff's overall claim of discrimination.   The Court considers this theory more fully below.

[45] *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 625 (6th Cir. 2013).

decision causing a significant change in benefits."[46]  Generally, an increased workload or "alteration

of job responsibilities" does not constitute a materially adverse employment action.[47]  Therefore, the

Court holds that even if Plaintiff had not abandoned the claim, Defendant is entitled to summary

judgment on Plaintiff's claim for the inequitable assignment of job duties.

## B. The Last Chance Agreement

Second, Plaintiff alleges that Defendant discriminated against him by issuing the last chance

agreement in January 2008.  Although Defendant disciplined Plaintiff over the incident with Claude

Taylor, Defendant never took disciplinary action against Taylor.  Defendant argues at summary

judgment that Plaintiff cannot show that he and Taylor were similarly situated.[48]  Just as with his

claim over the increase in his workload, Plaintiff has not responded to Defendant's argument in his

brief, suggesting that Plaintiff has abandoned the issue at summary judgment.  The Court holds that

Defendant would be entitled to summary judgment on this basis alone.  Even on its merits, the Court

concludes that Plaintiff cannot make out a prima facie case of discrimination based on disparate

discipline.

It is undisputed that Defendant treated Taylor more favorably than Plaintiff after HR's

investigation: Plaintiff was placed on a last chance agreement, and Taylor was not.  The issue

---

[46] *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010) (quotation omitted).

[47] *Id.*; *Blackburn v. Shelby Cnty.*, 770 F. Supp. 2d 896, 922 (W.D. Tenn. 2011) (McCalla, C.J.) (holding that an increase in job responsibilities is not a materially adverse employment action).

[48] Defendant has not raised the issue of whether the last chance agreement was an adverse employment action, and so the Court assumes for purposes of its analysis that the agreement was a materially adverse change in Plaintiff's employment status.  Furthermore, Defendant has not asserted that any claim based on the last chance agreement, which Defendant imposed on Plaintiff in 2008, is now time barred.  The Court need not reach these issues then.

presented is whether Plaintiff and Taylor were similarly situated.  The Sixth Circuit has held that in order to make this showing, a "plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment."[49]  Rather Plaintiff's burden is to show that the plaintiff and the comparator are similarly situated in "all relevant respects."[50]  In the context of disparate disciplinary treatment, the Sixth Circuit has explained that "the plaintiff and his proposed comparator must have engaged in acts of 'comparable seriousness.'"[51] As part of its analysis of this element, the Court must examine "certain factors, such as whether the individuals have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."[52]

The Court holds that Plaintiff has failed to show that he and Taylor "engaged in the same conduct" or in acts of "comparable seriousness."   Defendant issued Plaintiff the last chance agreement based on its determination that Plaintiff had made a verbal threat to Taylor.   In fact, Plaintiff admits to telling Taylor that the next time Plaintiff's "elbow might be in [Taylor's] face."[53] Taylor considered Plaintiff's statement a threat.  By contrast, there is no evidence that during the incident with Plaintiff, Taylor ever made a verbal threat or engaged in other conduct to violate

---

[49] *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916–17 (6th Cir. 2013) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998)).

[50] *Id.* at 917 (citations omitted).

[51] *Id.* (citation omitted).

[52] *Id.* (citation omitted).

[53] Ortiz Dep. 107:9–16.

Defendant's zero-tolerance policy on workplace violence. Plaintiff simply asserts that he does not believe that Taylor's bumping into him was accidental, but Plaintiff has not shown that Taylor's conduct violated Defendant's zero-tolerance policy. What is more, Defendant's investigation of the incident found otherwise. Defendant determined that Plaintiff had violated the plant's zero-tolerance policy by making a verbal threat and that Taylor had not violated the zero-tolerance policy. From this record a reasonable juror could not find that Plaintiff and Taylor had engaged in conduct of "comparable seriousness" such as to render the two similarly situated. Therefore, even if Plaintiff had not abandoned the issue, the Court concludes that Defendant is entitled to summary judgment on the last chance agreement claim.

## C. Termination

Finally, Defendant seeks summary judgment on Plaintiff's claim that Defendant discriminated against him by terminating his employment. Defendant argues that Plaintiff cannot show that a similarly situated, non-protected employee engaged in similar conduct but received more favorable treatment, i.e. Defendant did not terminate the non-protected employee. As previously discussed, Plaintiff "need not demonstrate an exact correlation with the employee receiving more favorable treatment" but merely show that the plaintiff and the comparator are similarly situated in "all relevant respects."[54] In order to satisfy his burden, Plaintiff must adduce evidence of a similarly situated, non-protected employee "subject to the same standards," engaging in acts of "comparable seriousness," and receiving more favorable disciplinary treatment than Plaintiff. Specifically,

---

[54] *Martinez*, 703 F.3d at 916–17.

Plaintiff must show that a non-Hispanic employee on a last chance agreement had a comparable record of QC violations but was not terminated.[55]

The Court holds as a matter of law that Plaintiff has no evidence of this kind to support his termination claim. Plaintiff has failed to adduce any evidence of a similarly situated, non-protected employee engaging in comparable conduct and receiving more favorable disciplinary treatment. Defendant decided to terminate Plaintiff based not only on the two QC violations occurring in the same week of August 2010 but also on Plaintiff's multiple QC violations since 2007 and his last chance agreement. Plaintiff admits as much in his summary judgment briefing. Plaintiff concedes that his QC violations occurred and that the other operators to which he would compare himself did not have a comparable number of QC violations over the same span of time and were not working under last chance agreements. Therefore, because Plaintiff cannot prove that a comparator employee committed similar violations but was not terminated, Defendant is entitled to judgment as a matter of law on Plaintiff's termination claim.

To excuse his failure to make this showing, Plaintiff argues that no other operator at the Memphis plant was similarly situated in that no other operator had as many job responsibilities as Plaintiff. For example, Plaintiff contends that he "performed twice the workload of Wes Garlock [a caucasian employee] as operator for Hershey, yet he was held to the same hourly quality checks, immediate reporting requirements, and the same margin of error and time constraints as other

---

[55] The fact that Plaintiff was on a last chance agreement is particularly relevant to the standards governing Plaintiff's workplace conduct. Plaintiff understood as part of his last chance agreement that he would face immediate termination for any further violations of company policy. It is undisputed that Defendant considered the last chance agreement in reaching its decision to dismiss Plaintiff. At summary judgment Plaintiff has adduced no evidence of a comparator employee committing similar QC violations, with or without a last chance agreement.

similarly situated non-Hispanic press operators."[56]   In other words, Plaintiff contends that had Defendant not assigned Plaintiff as many job duties, Plaintiff would have performed his job with fewer errors.  As such, non-Hispanic operators received more favorable treatment while Defendant held Plaintiff to a higher standard.

The Court finds Plaintiff's "set up to fail" theory unpersuasive.  First, no reasonable juror could find from the undisputed evidence that Defendant treated Plaintiff differently on account of his race by placing him on a last chance agreement, increasing his responsibilities, and then terminating him.  The record shows that Defendant issued Plaintiff a last chance agreement in January 2008 for his verbal altercation with Taylor.  Under the terms of the LCA, Plaintiff was subject to immediate termination for any further violations of company policy including quality control or work quality standards.  And yet the evidence shows that after the LCA was in place, Plaintiff received three work-related write-ups (dated January 24, 2009; May 27, 2009; and March 22, 2010), and Defendant never contemplated terminating him.  In fact, after the March 22, 2010 write-up, plant policy stated that Plaintiff should have received a one-day suspension without pay, but Grandberry decided not to suspend him, much less dismiss him.[57]  There is also undisputed evidence that Plaintiff received additional help in performing his job at times during 2007 and 2008.  These undisputed facts show then that rather than using the last chance agreement and his additional workload against Plaintiff, Defendant actually gave Plaintiff multiple chances.  The Court holds that

---

[56] Pl.'s Resp. in Opp'n 9 (D.E. # 61).  Plaintiff also argues that Gary Johnson, a back-up press operator for Defendant who is African-American, had a less demanding workload.

[57] Likewise, Plaintiff committed a quality control violation on September 11, 2007, which occurred before he was issued his last chance agreement.  The evidence shows that under plant policy Plaintiff should have been suspended for one day without pay.  However, Defendant decided not to suspend him.

viewing this evidence in the light most favorable to Plaintiff, a reasonable juror could not find that Defendant set Plaintiff up to fail on account of his race by issuing the LCA, assigning Plaintiff extra work, and then disciplining him for his on-the-job errors.

Moreover, under Plaintiff's "set up to fail" theory of disparate treatment, there is simply no relevant comparator to establish that Defendant treated Plaintiff differently on account of his race. The Sixth Circuit has repeatedly held that in order to make a prima facie case of disparate discipline, a plaintiff must show he was treated differently than similarly situated non-protected employees, specifically that the plaintiff and his comparator committed acts of "comparable seriousness."[58] Plaintiff has not made this showing here. Plaintiff's argument actually conflates the elements of proof for two discrete allegations of discrimination, the assignment of work responsibilities and his termination. Evidence that Plaintiff was assigned greater duties than other non-protected employees would go to show that Defendant discriminated against him in the assignment of work. However, for the reasons already discussed, an increase in the assignment of work duties does not constitute a materially adverse action and cannot support an independent claim of disparate treatment. Therefore, the Court rejects Plaintiff's argument on this point.

Even if Plaintiff could make out his prima facie case of discrimination based on evidence of increased responsibilities, it is undisputed that Defendant has produced a legitimate, nondiscriminatory reason for terminating Plaintiff's employment. Defendant has shown that it terminated Plaintiff's employment for an accumulation of workplace policy violations. The burden then shifts back to Plaintiff to prove that Defendant's reasons for his termination were pretext for

---

[58] *E.g. Martinez*, 703 F.3d at 917; *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 287 (6th Cir. 2012); *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012).

discrimination. Plaintiff may show that (1) Defendant's stated reasons had no basis in fact, (2) the stated reasons were not the actual reasons, or (3) the stated reasons were insufficient to explain Defendant's actions.[59] Plaintiff concedes in this case that Defendant's stated reasons had a basis in fact; Plaintiff admits that the QC violations occurred. Plaintiff simply argues that his "less favorable treatment exposed [him] to a greater risk of error."[60] Plaintiff has adduced no other evidence that the stated reasons for his termination were not the actual reasons or that the stated reasons were insufficient to explain Defendant's decision to terminate him. Plaintiff has no proof then that Defendant's legitimate reason for terminating him, an accumulation of policy violations, was a pretext for discrimination. Therefore, summary judgment is proper on Plaintiff's termination claim.

## <u>CONCLUSION</u>

The Court holds that Plaintiff has not carried his burden to survive summary judgment as to his theories of race discrimination. Furthermore, Plaintiff has abandoned his claims for gender discrimination and retaliation. Therefore, Defendant's Motion for Summary Judgment is **GRANTED**.

      **IT IS SO ORDERED.**

                              **s/ S. Thomas Anderson**
                              S. THOMAS ANDERSON
                              UNITED STATES DISTRICT JUDGE

                              Date: October 4, 2013.

---

[59] *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

[60] Pl.'s Resp. in Opp'n 13 (D.E. # 61).